# SOUTHEASTERN COMMUNITY COLLEGE *v.* DAVIS

No. 78–711. Argued April 23, 1979—Decided June 11, 1979

POWELL, J., delivered the opinion for a unanimous Court.

*Eugene Gressman* argued the cause for petitioner. With him on the briefs was *Edward L. Williamson.*

*Marc P. Charmatz* argued the cause for respondent. With him on the brief were *Seymour DuBow, Philip A. Diehl,* and *Warren L. Pate.* *

---

*A brief of *amici curiae* urging reversal was filed by the Attorneys General for their respective States as follows: *Francis X. Bellotti* for Massachusetts, *J. Marshall Coleman* for Virginia, *Robert K. Corbin* for Arizona, *Carl R. Ajello* for Connecticut, *Richard S. Gebelein* for Delaware, *Jim Smith* for Florida, *Arthur K. Bolton* for Georgia, *Wayne Minami* for Hawaii, *David H. Leroy* for Idaho, *Theodore L. Sendak* for Indiana, *Tom Miller* for Iowa, *Robert T. Stephan* for Kansas, *William J. Guste, Jr.,* for Louisiana, *Stephen H. Sachs* for Maryland, *A. F. Summer* for Mississippi, *John D. Ashcroft* for Missouri, *Michael T. Greely* for Montana, *Paul L. Douglas* for Nebraska, *Thomas D. Rath* for New Hampshire, *John J. Degnan* for New Jersey, *Robert Abrams* for New York, *Rufus L. Edmisten* for North Carolina, *Allen I. Olson* for North Dakota, *William J. Brown* for Ohio, *Jan Eric Cartwright* for Oklahoma, *James A. Redden* for Oregon, *Daniel R. McLeod* for South Carolina, *William M. Leech, Jr.,* for Tennessee, *Mark White* for Texas, *Slade Gorton* for Washington, *Chauncey H. Browning, Jr.,* for West Virginia, and *Bronson C. LaFollette* for Wisconsin. Briefs of *amici curiae* urging reversal were filed by *Joseph A. Keyes, Jr.,* for the Association of American Medical Colleges; by *Daniel I. Sherry* for the Board of Trustees of Prince George's Community College; by *Susan A. Cahoon, William A. Wright,* and *Douglas S. McDowell* for the Equal Employment Advisory Council; and by *Richard A. Fulton* and *David M. Dorsen* for the National Institute for Independent Colleges and Universities et al.

Briefs of *amici curiae* urging affirmance were filed by *Solicitor General McCree, Assistant Attorney General Days, Brian K. Landsberg, Jessica Dunsay Silver,* and *Vincent F. O'Rourke, Jr.,* for the United States; by *George Deukmejian,* Attorney General, and *Katherine E. Stone* and *G. R. Overton,* Deputy Attorneys General, for the State of California; by *Frank*

Mr. Justice Powell delivered the opinion of the Court.

This case presents a matter of first impression for this Court: Whether § 504 of the Rehabilitation Act of 1973, which prohibits discrimination against an "otherwise qualified handicapped individual" in federally funded programs "solely by reason of his handicap," forbids professional schools from imposing physical qualifications for admission to their clinical training programs.

I

Respondent, who suffers from a serious hearing disability, seeks to be trained as a registered nurse. During the 1973–1974 academic year she was enrolled in the College Parallel program of Southeastern Community College, a state institution that receives federal funds. Respondent hoped to progress to Southeastern's Associate Degree Nursing program, completion of which would make her eligible for state certification as a registered nurse. In the course of her application to the nursing program, she was interviewed by a member of the nursing faculty. It became apparent that respondent had difficulty understanding questions asked, and on inquiry she acknowledged a history of hearing problems and dependence on a hearing aid. She was advised to consult an audiologist.

J. Laski and Michael Churchill for the American Coalition of Citizens with Disabilities et al.; by Stanley Fleishman for the California Association for the Physically Handicapped et al.; by Ann Fagan Ginger for the Center for Independent Living et al.; by Douglas L. Parker for the Institute for Public Representation et al.; and by John E. Kirklin for the New York City Council of Organizations Serving the Deaf et al.

Briefs of amici curiae were filed by Edward G. Biester, Jr., Attorney General, and Robert E. Rains, Allen C. Warshaw, and J. Justin Blewitt, Jr., Deputy Attorneys General, for Pennsylvania; by John D. Lane for the American Association for the Advancement of Science et al.; by Fred Okrand and Sam Rosenwein for the American Civil Liberties Union et al.; by Sheldon Elliot Steinbach for the American Council on Education; and by Elizabeth C. Bunting for the Board of Governors of the University of North Carolina.

On the basis of an examination at Duke University Medical Center, respondent was diagnosed as having a "bilateral, sensori-neural hearing loss." App. 127a. A change in her hearing aid was recommended, as a result of which it was expected that she would be able to detect sounds "almost as well as a person would who has normal hearing." *Id.*, at 127a–128a. But this improvement would not mean that she could discriminate among sounds sufficiently to understand normal spoken speech. Her lipreading skills would remain necessary for effective communication: "While wearing the hearing aid, she is well aware of gross sounds occurring in the listening environment. However, she can only be responsible for speech spoken to her, when the talker gets her attention and allows her to look directly at the talker." *Id.*, at 128a.

Southeastern next consulted Mary McRee, Executive Director of the North Carolina Board of Nursing. On the basis of the audiologist's report, McRee recommended that respondent not be admitted to the nursing program. In McRee's view, respondent's hearing disability made it unsafe for her to practice as a nurse.[1] In addition, it would be impossible for respondent to participate safely in the normal clinical training program, and those modifications that would be necessary to enable safe participation would prevent her from

---

[1] McRee also wrote that respondent's hearing disability could preclude her practicing safely in "any setting" allowed by "a license as L[icensed] P[ractical] N[urse]." App. 132a. Respondent contends that inasmuch as she already was licensed as a practical nurse, McRee's opinion was inherently incredible. But the record indicates that respondent had "not worked as a licensed practical nurse except to do a little bit of private duty," *id.*, at 32a, and had not done that for several years before applying to Southeastern. Accordingly, it is at least possible to infer that respondent in fact could not work safely as a practical nurse in spite of her license to do so. In any event, we note the finding of the District Court that "a Licensed Practical Nurse, unlike a Licensed Registered Nurse, operates under constant supervision and is not allowed to perform medical tasks which require a great degree of technical sophistication." 424 F. Supp. 1341, 1342–1343 (EDNC 1976).

realizing the benefits of the program: "To adjust patient learning experiences in keeping with [respondent's] hearing limitations could, in fact, be the same as denying her full learning to meet the objectives of your nursing programs." *Id.*, at 132a–133a.

After respondent was notified that she was not qualified for nursing study because of her hearing disability, she requested reconsideration of the decision. The entire nursing staff of Southeastern was assembled, and McRee again was consulted. McRee repeated her conclusion that on the basis of the available evidence, respondent "has hearing limitations which could interfere with her safely caring for patients." *Id.*, at 139a. Upon further deliberation, the staff voted to deny respondent admission.

Respondent then filed suit in the United States District Court for the Eastern District of North Carolina, alleging both a violation of § 504 of the Rehabilitation Act of 1973, 87 Stat. 394, as amended, 29 U. S. C. § 794 (1976 ed., Supp. III),[2]

---

[2] The statute, as set forth in 29 U. S. C. § 794 (1976 ed., Supp. III), provides in full:

"No otherwise qualified handicapped individual in the United States, as defined in section 706 (7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance *or under any program or activity conducted by any Executive agency or by the United States Postal Service. The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978. Copies of any proposed regulation shall be submitted to appropriate authorizing committees of the Congress, and such regulation may take effect no earlier than the thirtieth day after the date on which such regulation is so submitted to such committees.*"

The italicized portion of the section was added by § 119 of the Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978, 92 Stat. 2982. Respondent asserts no claim under this portion of the statute.

and a denial of equal protection and due process. After a bench trial, the District Court entered judgment in favor of Southeastern. 424 F. Supp. 1341 (1976). It confirmed the findings of the audiologist that even with a hearing aid respondent cannot understand speech directed to her except through lipreading, and further found:

> "[I]n many situations such as an operation room intensive care unit, or post-natal care unit, all doctors and nurses wear surgical masks which would make lipreading impossible. Additionally, in many situations a Registered Nurse would be required to instantly follow the physician's instructions concerning procurement of various types of instruments and drugs where the physician would be unable to get the nurse's attention by other than vocal means." *Id.*, at 1343.

Accordingly, the court concluded:

> "[Respondent's] handicap actually prevents her from safely performing in both her training program and her proposed profession. The trial testimony indicated numerous situations where [respondent's] particular disability would render her unable to function properly. Of particular concern to the court in this case is the potential of danger to future patients in such situations." *Id.*, at 1345.

Based on these findings, the District Court concluded that respondent was not an "otherwise qualified handicapped individual" protected against discrimination by § 504. In its view, "[o]therwise qualified, can only be read to mean otherwise able to function sufficiently in the position sought in spite of the handicap, if proper training and facilities are suitable and available." 424 F. Supp., at 1345. Because respondent's disability would prevent her from functioning "sufficiently" in Southeastern's nursing program, the court

held that the decision to exclude her was not discriminatory within the meaning of § 504.[3]

On appeal, the Court of Appeals for the Fourth Circuit reversed. 574 F. 2d 1158 (1978). It did not dispute the District Court's findings of fact, but held that the court had misconstrued § 504. In light of administrative regulations that had been promulgated while the appeal was pending, see 42 Fed. Reg. 22676 (1977),[4] the appellate court believed that § 504 required Southeastern to "reconsider plaintiff's application for admission to the nursing program without regard to her hearing ability." 574 F. 2d, at 1160. It concluded that the District Court had erred in taking respondent's handicap into account in determining whether she was "otherwise qualified" for the program, rather than confining its inquiry to her "academic and technical qualifications." *Id.*, at 1161. The Court of Appeals also suggested that § 504 required "affirmative conduct" on the part of Southeastern to modify its program to accommodate the disabilities of applicants, "even when such modifications become expensive." 574 F. 2d, at 1162.

Because of the importance of this issue to the many institutions covered by § 504, we granted certiorari. 439 U. S. 1065 (1979). We now reverse.[5]

---

[3] The District Court also dismissed respondent's constitutional claims. The Court of Appeals affirmed that portion of the order, and respondent has not sought review of this ruling.

[4] Relying on the plain language of the Act, the Department of Health, Education, and Welfare (HEW) at first did not promulgate any regulations to implement § 504. In a subsequent suit against HEW, however, the United States District Court for the District of Columbia held that Congress had intended regulations to be issued and ordered HEW to do so. *Cherry* v. *Mathews,* 419 F. Supp. 922 (1976). The ensuing regulations currently are embodied in 45 CFR pt. 84 (1978).

[5] In addition to challenging the construction of § 504 by the Court of Appeals, Southeastern also contends that respondent cannot seek judicial relief for violations of that statute in view of the absence of any express private right of action. Respondent asserts that whether or not § 504

## II

As previously noted, this is the first case in which this Court has been called upon to interpret § 504. It is elementary that "[t]he starting point in every case involving construction of a statute is the language itself." *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723, 756 (1975) (POWELL, J., concurring); see *Greyhound Corp.* v. *Mt. Hood Stages, Inc.,* 437 U. S. 322, 330 (1978); *Santa Fe Industries, Inc.* v. *Green,* 430 U. S. 462, 472 (1977). Section 504 by its terms does not compel educational institutions to disregard the disabilities of handicapped individuals or to make substantial modifications in their programs to allow disabled persons to participate. Instead, it requires only that an "otherwise qualified handicapped individual" not be excluded from participation in a federally funded program "solely by reason of his handicap," indicating only that mere possession of a handicap is not a permissible ground for assuming an inability to function in a particular context.[6]

---

provides a private action, she may maintain her suit under 42 U. S. C. § 1983. In light of our disposition of this case on the merits, it is unnecessary to address these issues and we express no views on them. See *Norton* v. *Mathews,* 427 U. S. 524, 529–531 (1976); *Moor* v. *County of Alameda,* 411 U. S. 693, 715 (1973); *United States* v. *Augenblick,* 393 U. S. 348, 351–352 (1969).

[6] The Act defines "handcapped individual" as follows:

"The term 'handicapped individual' means any individual who (A) has a physical or mental disability which for such individual constitutes or results in a substantial handicap to employment and (B) can reasonably be expected to benefit in terms of employability from vocational rehabilitation services provided pursuant to subchapters I and III of this chapter. For the purposes of subchapters IV and V of this chapter, such term means any person who (A) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (B) has a record of such an impairment, or (C) is regarded as having such an impairment." § 7 (6) of the Rehabilitation Act of 1973, 87 Stat. 361, as amended, 88 Stat. 1619, 89 Stat. 2–5, 29 U. S. C. § 706 (6).

This definition comports with our understanding of § 504. A person who

The court below, however, believed that the "otherwise qualified" persons protected by § 504 include those who would be able to meet the requirements of a particular program in every respect except as to limitations imposed by their handicap. See 574 F. 2d, at 1160. Taken literally, this holding would prevent an institution from taking into account any limitation resulting from the handicap, however disabling. It assumes, in effect, that a person need not meet legitimate physical requirements in order to be "otherwise qualified." We think the understanding of the District Court is closer to the plain meaning of the statutory language. An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap.

The regulations promulgated by the Department of HEW to interpret § 504 reinforce, rather than contradict, this conclusion. According to these regulations, a "[q]ualified handicapped person" is, "[w]ith respect to postsecondary and vocational education services, a handicapped person who meets the academic and technical standards requisite to admission or participation in the [school's] education program or activity . . . ." 45 CFR § 84.3 (k)(3) (1978). An explanatory note states:

> "The term 'technical standards' refers to *all* nonacademic admissions criteria that are essential to participation in the program in question." 45 CFR pt. 84, App. A, p. 405 (1978) (emphasis supplied).

has a record of, or is regarded as having, an impairment may at present have no actual incapacity at all. Such a person would be exactly the kind of individual who could be "otherwise qualified" to participate in covered programs. And a person who suffers from a limiting physical or mental impairment still may possess other abilities that permit him to meet the requirements of various programs. Thus, it is clear that Congress included among the class of "handicapped" persons covered by § 504 a range of individuals who could be "otherwise qualified." See S. Rep. No. 93-1297, pp. 38-39 (1974).

A further note emphasizes that legitimate physical qualifications may be essential to participation in particular programs.[7] We think it clear, therefore, that HEW interprets the "other" qualifications which a handicapped person may be required to meet as including necessary physical qualifications.

### III

The remaining question is whether the physical qualifications Southeastern demanded of respondent might not be necessary for participation in its nursing program. It is not open to dispute that, as Southeastern's Associate Degree Nursing program currently is constituted, the ability to understand speech without reliance on lipreading is necessary for patient safety during the clinical phase of the program. As the District Court found, this ability also is indispensable for many of the functions that a registered nurse performs.

Respondent contends nevertheless that § 504, properly interpreted, compels Southeastern to undertake affirmative action that would dispense with the need for effective oral communication. First, it is suggested that respondent can be given individual supervision by faculty members whenever she attends patients directly. Moreover, certain required courses might be dispensed with altogether for respondent. It is not

---

[7] The note states:

"Paragraph (k) of § 84.3 defines the term 'qualified handicapped person.' Throughout the regulation, this term is used instead of the statutory term 'otherwise qualified handicapped person.' The Department believes that the omission of the word 'otherwise' is necessary in order to comport with the intent of the statute because, read literally, 'otherwise' qualified handicapped persons include persons who are qualified except for their handicap, rather than in spite of their handicap. Under such a literal reading, a blind person possessing all the qualifications for driving a bus except sight could be said to be 'otherwise qualified' for the job of driving. Clearly, such a result was not intended by Congress. In all other respects, the terms 'qualified' and 'otherwise qualified' are intended to be interchangeable." 45 CFR pt. 84, App. A, p. 405 (1978).

necessary, she argues, that Southeastern train her to undertake all the tasks a registered nurse is licensed to perform. Rather, it is sufficient to make § 504 applicable if respondent might be able to perform satisfactorily some of the duties of a registered nurse or to hold some of the positions available to a registered nurse.[8]

Respondent finds support for this argument in portions of the HEW regulations discussed above. In particular, a provision applicable to postsecondary educational programs requires covered institutions to make "modifications" in their programs to accommodate handicapped persons, and to provide "auxiliary aids" such as sign-language interpreters.[9] Respondent

[8] The court below adopted a portion of this argument:

"[Respondent's] ability to read lips aids her in overcoming her hearing disability; however, it was argued that in certain situations such as in an operating room environment where surgical masks are used, this ability would be unavailing to her.

"Be that as it may, in the medical community, there does appear to be a number of settings in which the plaintiff could perform satisfactorily as an RN, such as in industry or perhaps a physician's office. Certainly [respondent] could be viewed as possessing extraordinary insight into the medical and emotional needs of those with hearing disabilities.

"If [respondent] meets all the other criteria for admission in the pursuit of her RN career, under the relevant North Carolina statutes, N. C. Gen. Stat. §§ 90–158, et seq., it should not be foreclosed to her simply because she may not be able to function effectively in all the roles which registered nurses may choose for their careers." 574 F. 2d 1158, 1161 n. 6 (1978).

[9] This regulation provides:

"(a) *Academic requirements.* A recipient [of federal funds] to which this subpart applies shall make such modifications to its academic requirements as are necessary to ensure that such requirements do not discriminate or have the effect of discriminating, on the basis of handicap, against a qualified handicapped applicant or student. Academic requirements that the recipient can demonstrate are essential to the program of instruction being pursued by such student or to any directly related licensing requirement will not be regarded as discriminatory within the meaning of this section. Modifications may include changes in the length of time permitted for the completion of degree requirements, substitution of specific

argues that this regulation imposes an obligation to ensure full participation in covered programs by handicapped individuals and, in particular, requires Southeastern to make the kind of adjustments that would be necessary to permit her safe participation in the nursing program.

We note first that on the present record it appears unlikely respondent could benefit from any affirmative action that the regulation reasonably could be interpreted as requiring. Section 84.44 (d)(2), for example, explicitly excludes "devices or services of a personal nature" from the kinds of auxiliary aids a school must provide a handicapped individual. Yet the only evidence in the record indicates that nothing less than close, individual attention by a nursing instructor would be sufficient to ensure patient safety if respondent took part in the clinical phase of the nursing program. See 424 F. Supp., at 1346. Furthermore, it also is reasonably clear that § 84.44 (a) does not encompass the kind of curricular changes that would be necessary to accommodate respondent in the nursing program. In light of respondent's inability to function in clinical courses without close supervision, Southeastern, with prudence, could

---

courses required for the completion of degree requirements, and adaptation of the manner in which specific courses are conducted.

. . . . .

"(d) *Auxiliary aids.* (1) A recipient to which this subpart applies shall take such steps as are necessary to ensure that no handicapped student is denied the benefits of, excluded from participation in, or otherwise subjected to discrimination under the education program or activity operated by the recipient because of the absence of educational auxiliary aids for students with impaired sensory, manual, or speaking skills.

"(2) Auxiliary aids may include taped texts, interpreters or other effective methods of making orally delivered materials available to students with hearing impairments, readers in libraries for students with visual impairments, classroom equipment adapted for use by students with manual impairments, and other similar services and actions. Recipients need not provide attendants, individually prescribed devices, readers for personal use or study, or other devices or services of a personal nature." 45 CFR § 84.44 (1978).

allow her to take only academic classes. Whatever benefits respondent might realize from such a course of study, she would not receive even a rough equivalent of the training a nursing program normally gives. Such a fundamental alteration in the nature of a program is far more than the "modification" the regulation requires.

Moreover, an interpretation of the regulations that required the extensive modifications necessary to include respondent in the nursing program would raise grave doubts about their validity. If these regulations were to require substantial adjustments in existing programs beyond those necessary to eliminate discrimination against otherwise qualified individuals, they would do more than clarify the meaning of § 504. Instead, they would constitute an unauthorized extension of the obligations imposed by that statute.

The language and structure of the Rehabilitation Act of 1973 reflect a recognition by Congress of the distinction between the evenhanded treatment of qualified handicapped persons and affirmative efforts to overcome the disabilities caused by handicaps. Section 501 (b), governing the employment of handicapped individuals by the Federal Government, requires each federal agency to submit "an affirmative action program plan for the hiring, placement, and advancement of handicapped individuals . . . ." These plans "shall include a description of the extent to which and methods whereby the special needs of handicapped employees are being met." Similarly, § 503 (a), governing hiring by federal contractors, requires employers to "take affirmative action to employ and advance in employment qualified handicapped individuals . . . ." The President is required to promulgate regulations to enforce this section.

Under § 501 (c) of the Act, by contrast, state agencies such as Southeastern are only "encourage[d] . . . to adopt and implement such policies and procedures." Section 504 does not refer at all to affirmative action, and except as it applies to

federal employers it does not provide for implementation by administrative action. A comparison of these provisions demonstrates that Congress understood accommodation of the needs of handicapped individuals may require affirmative action and knew how to provide for it in those instances where it wished to do so.[10]

Although an agency's interpretation of the statute under which it operates is entitled to some deference, "this deference is constrained by our obligation to honor the clear meaning of a statute, as revealed by its language, purpose, and history." *Teamsters* v. *Daniel,* 439 U. S. 551, 566 n. 20 (1979). Here, neither the language, purpose, nor history of § 504 reveals an intent to impose an affirmative-action obligation on all recipients of federal funds.[11] Accordingly, we hold that even if

---

[10] Section 115 (a) of the Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978 added to the 1973 Act a section authorizing grants to state units for the purpose of providing "such information and technical assistance (including support personnel such as interpreters for the deaf) as may be necessary to assist those entities in complying with this Act, particularly the requirements of section 504." 92 Stat. 2971, 29 U. S. C. § 775 (a) (1976 ed., Supp. III). This provision recognizes that on occasion the elimination of discrimination might involve some costs; it does not imply that the refusal to undertake substantial changes in a program by itself constitutes discrimination. Whatever effect the availability of these funds might have on ascertaining the existence of discrimination in some future case, no such funds were available to Southeastern at the time respondent sought admission to its nursing program.

[11] The Government, in a brief *amicus curiae* in support of respondent, cites a Report of the Senate Committee on Labor and Public Welfare on the 1974 amendments to the 1973 Act and several statements by individual Members of Congress during debate on the 1978 amendments, some of which indicate a belief that § 504 requires affirmative action. See Brief for United States as *Amicus Curiae* 44–50. But these isolated statements by individual Members of Congress or its committees, all made after the enactment of the statute under consideration, cannot substitute for a clear expression of legislative intent at the time of enactment. *Quern* v. *Mandley,* 436 U. S. 725, 736 n. 10 (1978); *Los Angeles Dept. of*

HEW has attempted to create such an obligation itself, it lacks the authority to do so.

## IV

We do not suggest that the line between a lawful refusal to extend affirmative action and illegal discrimination against handicapped persons always will be clear. It is possible to envision situations where an insistence on continuing past requirements and practices might arbitrarily deprive genuinely qualified handicapped persons of the opportunity to participate in a covered program. Technological advances can be expected to enhance opportunities to rehabilitate the handicapped or otherwise to qualify them for some useful employment. Such advances also may enable attainment of these goals without imposing undue financial and administrative burdens upon a State. Thus, situations may arise where a

---

*Water & Power* v. *Manhart*, 435 U. S. 702, 714 (1978). Nor do these comments, none of which represents the will of Congress as a whole, constitute subsequent "legislation" such as this Court might weigh in construing the meaning of an earlier enactment. Cf. *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 380–381 (1969).

The Government also argues that various amendments to the 1973 Act contained in the Rehabilitation Act Amendments of 1978 further reflect Congress' approval of the affirmative-action obligation created by HEW's regulations. But the amendment most directly on point undercuts this position. In amending § 504, Congress both extended that section's prohibition of discrimination to "any program or activity conducted by any Executive agency or by the United States Postal Service" and authorized administrative regulations to implement only *this amendment.* See n. 2, *supra.* The fact that no other regulations were mentioned supports an inference that no others were approved.

Finally, we note that the assertion by HEW of the authority to promulgate any regulations under § 504 has been neither consistent nor longstanding. For the first three years after the section was enacted, HEW maintained the position that Congress had not intended any regulations to be issued. It altered its stand only after having been enjoined to do so. See n. 4, *supra.* This fact substantially diminishes the deference to be given to HEW's present interpretation of the statute. See *General Electric Co.* v. *Gilbert*, 429 U. S. 125, 143 (1976).

refusal to modify an existing program might become unreasonable and discriminatory. Identification of those instances · where a refusal to accommodate the needs of a disabled person amounts to discrimination against the handicapped continues to be an important responsibility of HEW.

In this case, however, it is clear that Southeastern's unwillingness to make major adjustments in its nursing program does not constitute such discrimination. The uncontroverted testimony of several members of Southeastern's staff and faculty established that the purpose of its program was to train persons who could serve the nursing profession in all customary ways. See, e. g., App. 35a, 52a, 53a, 71a, 74a. This type of purpose, far from reflecting any animus against handicapped individuals, is shared by many if not most of the institutions that train persons to render professional service. It is undisputed that respondent could not participate in Southeastern's nursing program unless the standards were substantially lowered. Section 504 imposes no requirement upon an educational institution to lower or to effect substantial modifications of standards to accommodate a handicapped person.[12]

---

[12] Respondent contends that it is unclear whether North Carolina law requires a registered nurse to be capable of performing all functions open to that profession in order to obtain a license to practice, although McRee, the Executive Director of the State Board of Nursing, had informed Southeastern that the law did so require. See App. 138a–139a. Respondent further argues that even if she is not capable of meeting North Carolina's present licensing requirements, she still might succeed in obtaining a license in another jurisdiction.

Respondent's argument misses the point. Southeastern's program, structured to train persons who will be able to perform all normal roles of a registered nurse, represents a legitimate academic policy, and is accepted by the State. In effect, it seeks to ensure that no graduate will pose a danger to the public in any professional role in which he or she might be cast. Even if the licensing requirements of North Carolina or some other State are less demanding, nothing in the Act requires an educational institution to lower its standards.

.

One may admire respondent's desire and determination to overcome her handicap, and there well may be various other types of service for which she can qualify. In this case, however, we hold that there was no violation of § 504 when Southeastern concluded that respondent did not qualify for admission to its program. Nothing in the language or history of § 504 reflects an intention to limit the freedom of an educational institution to require reasonable physical qualifications for admission to a clinical training program. Nor has there been any showing in this case that any action short of a substantial change in Southeastern's program would render unreasonable the qualifications it imposed.

## V

Accordingly, we reverse the judgment of the court below, and remand for proceedings consistent with this opinion.

*So ordered.*