Robert J. CRANE, Plaintiff,

v.

Elizabeth DOLE, et al., Defendants.

Civ. A. No. 81–1081.

United States District Court,
District of Columbia.

Feb. 26, 1985.

Marc P. Charmatz, Washington, D.C., for plaintiff.

Charles F. Flynn, Asst. U.S. Atty., Washington, D.C., James W. Whitlow, Off. Chief Counsel, F.A.A., Washington, D.C., for defendants.

MEMORANDUM OPINION

JOHN GARRETT PENN, District Judge.

The plaintiff filed this action pursuant to the Rehabilitation Act of 1973 (Act), 29 U.S.C. §§ 791 and 794a and the Administrative Procedure Act (APA), 5 U.S.C. § 501 *et seq.* He alleges that the defendants violated the Act by discriminating against him based solely on his physical handicap, a hearing loss, and that they violated the APA by treating him in a wholly arbitrary and capricious manner. He contends that he is entitled to placement in a position as an Aeronautical Information Specialist (AIS) in the National Flight Data Center of the Federal Aviation Administration (FAA) with back pay, "including appropriate account taken for step and grade promotions, and attorneys' fees and costs incurred in this action". The case came before the Court for a trial *de novo.* This memorandum opinion constitutes the Court's findings of fact and conclusions of law. *See* Fed.R.Civ.P. 52.

I

1. Plaintiff Robert Crane is a hearing-impaired individual. He uses a hearing aid, and at times, hearing aids.

2. From 1966 to 1976, plaintiff was an employee of the FAA. For eight of those ten years he worked as an air traffic control specialist (station), GS–2152, a position in which he provided advice and guidance to general aviation pilots and which required, on certain occasions, in-flight communications with pilots and handling of airborne emergencies. During one two-year period, plaintiff held the position of evaluations, proficiency and development specialist, where his principal task was training others.

3. The medical requirements for the position of air traffic control specialist include the requirement that the incumbent or applicant have no hearing loss of more than 25 decibels in the 500, 1000 or 2000 HZ ranges and must demonstrate no hearing loss in these ranges of more than 20 deci-

bels in the better ear, using ISO (1964) or ANSI (1969) standards.

4. In 1975, a hearing examination routinely conducted by the FAA revealed that plaintiff suffered from a hearing loss which ultimately resulted, in 1976, in a disability retirement from the FAA because he could no longer meet the stringent hearing requirements for the position of air traffic control specialist.

5. Later in 1976, plaintiff applied for another FAA position, as an Aeronautical Information Specialist, GS–1361–12 in the National Flight Data Center in Washington, D.C., FAA headquarters, which is responsible for the collection, verification and distribution of aeronautical data concerning the nation's airports, navigation system, air space and related subjects. The AIS position involves no in-flight communications with pilots or any other flight-control function.

6. The National Flight Data Center is divided into six separate functional areas, some of which are sections and some of which are combined into one section. All are staffed by Specialists in the GS–1361 series. The job descriptions of all sections other than the Notice to Airmen section are identical.

7. One section, the Flight Data Services Section, is responsible exclusively for publishing seven different compilations of data which appear at designated intervals of time and which are designed to keep the aviation community up to date on the status of flight paths, airports, air space, terminology and other relevant flight information. The seven publications are published on a specific schedule, most every 112 days. The shortest publication interval is 28 days, while the longest is quarterly. Specialists in the Flight Data Services Section prepare these publications.

8. Two other functional areas, Navigations Aids and Communications and Airports, are combined in one section and have similar functions. The navigation and communication specialists maintain information on the status of navigational aids and communications mechanisms used in the na-

tion's air traffic control system. They do this by receiving information on changes in the system, by verifying those changes, obtaining a written record and entering the changes into the data base used by the FAA for such information. Ninety-nine percent of the time this information is received in writing the ordinary course of business; emergency changes would be entered through a different mechanism, through the Notice of Airmen Section described below.

9. The Airports specialists maintain records on all public use of privately owned airports, including such matters as changes in operating hours of runways, services and other aspects of airport operation. They use the same methods to obtain, verify and transfer the information received as the navigations/communications specialists. It takes 15 days to get information from receipt to the data base. As with respect to the navigations and communications specialists, emergencies are handled through the Notice of Airmen Section.

10. Two of the sections, Air Space and Flight Procedures, are responsible for updating information on the routes on which and the procedures by which planes fly. The information for these sections almost always becomes a rulemaking component of the FAA inasmuch as the information received concerning these matters consists of rules or regulations of the agency. These sections receive the rules or regulations in writing and transmit that information in various ways on a specific cycle, such as 56 days for the Airspace Section.

11. The Notice to Airmen Section (NOTAM) differs from the other sections of the National Flight Data Center, despite the fact that the AIS are in the same job category and Civil Service designation, GS–1361. This section, as the job description states, is responsible for "ensur[ing] expeditious receipt, effective processing and dissemination of time-critical" information concerning changes in any aspect of the nation's flight data. The NOTAM section is divided into two parts, the domestic and international. The domestic section re-

ceives information from 371 flight service stations by teletypes in the National Flight Data Center; the international section receives information worldwide. The specialists who work in the NOTAM section receive teletyped pieces of information (NOTAMs) and, when necessary, verify it by contacting its sources. While, at present, specialists in the domestic part of the NOTAM section use the telephone to perform this task, this is not the only way in which verification can take place. For example, the international component verifies information by teletype; telephone verification is not used at all in the international section. Other means of verification are possible.

12. At the time plaintiff applied for the position of AIS in the National Flight Data Center, there existed no hearing requirements for the AIS job similar to those which existed for the position of air traffic control specialist. At the time he applied in 1976, the requirement for hearing was that imposed generally on federal employees, that is, the "ability to hear the conversational voice, with or without a hearing aid." The FAA does not test or otherwise make any effort to ascertain the hearing levels of its AIS in any section.

13. In 1978, Congress amended the Act, 29 U.S.C. § 794a. As a result of that legislation, the Office of Personnel Management revised the hearing requirements for AIS positions so as to provide, as of September 24, 1979, that "in most cases, a specific physical condition or impairment will not automatically disqualify an applicant for appointment." Rather, the new rule provides that the "loss or impairment of a specific function may be compensated for by the satisfactory use of a prosthesis or mechanical aid. Reasonable accommodation may also be considered in determining an applicant's ability to perform the duties of a position. Reasonable accommodation may include but is not limited to: the use of assistive devices, job modification or restructuring, provisions of readers and interpreters, or adjusted work schedules."

14. When plaintiff applied for the position of AIS, GS–13611–112, in 1976, he was found among the "best qualified" by personnel rules, but his name was inadvertently left off the list of best qualified applicants," the list of names from which a selecting official must make his selection. Thereafter, the agency reconsidered plaintiff for the position. The first time, the agency acknowledged erroneous procedures were used, and agreed to consider plaintiff again. The second time, the Court found the decision to be unlawful and remanded. The third consideration is at issue here.

15. After administrative appeal, the FAA agreed, on August 5, 1977, to give Mr. Crane "priority consideration" for the next AIS position at the National Flight Data Center.

16. Under FAA personnel rules, an applicant granted "priority consideration" must be considered for the next "appropriate" vacancy before other candidates are considered for the position. An "appropriate" vacancy is one which (a) would normally be filled competitively; (b) is at the same grade level as originally applied for; and (c) would be acceptable to the employee.

17. On February 13, 1978, Beauford Bancroft, director of the National Flight Data Center, considered plaintiff solely for a position in the NOTAM section and declined to select plaintiff.

18. The basis for Bancroft's decision was that plaintiff had been medically retired as a result of his hearing loss from his position as air traffic control specialist.

19. At the time of his decision, Bancroft had no authority to impose medical requirements on the position of AIS, had no knowledge of the extent of plaintiff's hearing loss and made no inquiries to determine what the extent of plaintiff's hearing loss was. Nor did Bancroft have any knowledge whether plaintiff had any difficulty using the telephone. He was unaware of any duty toward plaintiff with respect to his hearing impairment. Finally, at the time of the decision in 1978, Bancroft had

no knowledge whether plaintiff's hearing loss would affect his ability to perform the essential function of the job of AIS in the NOTAM section of any other National Flight Data Center section. The actions of Bancroft or the agency did not amount to an "intentional" discrimination against the plaintiff. In other words, the action of the agency was not done with bad faith or with the design to discriminate against plaintiff personally, or as the result of his handicap.

20. Plaintiff sought to challenge Bancroft's decision in ongoing litigation between the plaintiff and the Federal Aviation Administration, but at the suggestion of the Court, *see* Civil Action No. 77–0895, it was agreed to handle the matter through an administrative grievance. Plaintiff filed a grievance at the FAA. On October 17, 1979, the FAA decided the grievance. It found that Bancroft's decision "was not completely documented." The agency decided that it would "re-run" the priority consideration after a determination of applicable medical standards.

21. Pursuant to this decision, plaintiff reapplied and on November 7, 1980, was again turned down by John R. Ryan, the acting chief of the Operations Division, the official who was Bancroft's direct superior. In his decision, Ryan stated that plaintiff was not medically qualified for employment as an AIS. While the decision made reference to the position of AIS without regard to section, Ryan only considered plaintiff for a position in the domestic portion of the Notice to Airmen Section. He did not consider any other sections.

22. Ryan made no attempt to determine whether plaintiff could actually perform the job as an AIS. Nor did he consider whether reasonable accommodation of plaintiff's handicap would permit him to be hired as an AIS in the National Flight Data Center.

23. Plaintiff sought reconsideration of Ryan's decision. He submitted medical evidence, including the results of an examination by R. Emil Hecht, M.D., a board-certified otolaryngologist, a graduate with wings from the Aerospace Medical Institute Flight Surgery Training Program and a former aviation medical examiner.

24. On reconsideration, the agency reaffirmed its original decision. Its chief of the Labor Relations and Career Development Branch, Lionel R. Driscoll, stated, *inter alia*, that material provided by plaintiff was not relevant and affirmed the original decision.

25. Plaintiff then filed this lawsuit, alleging violations of the Act and the APA. On June 29, 1982, on cross-motions for summary judgment, the Court found that the decisions by Ryan and Driscoll violated the Act because they failed to determine whether plaintiff could perform the job and failed to consider any reasonable accommodations. *Crane v. Lewis*, 551 F.Supp. 27 (D.D.C.1982). The court also found that the decision of the agency was arbitrary and capricious under the APA in considering medical evidence plaintiff submitted irrelevant and drawing conclusions about plaintiff's ability to do the job without ascertaining relevant facts.

26. The Court remanded the case to the agency for further administrative consideration, particularly with respect to plaintiff's ability to perform the essentials of the job of AIS with a hearing aid and with respect to any other accommodations the agency might consider.

27. On remand, Mr. Ryan and the agency's attorney developed a "test" which purported to ascertain whether Mr. Crane could perform the job of an AIS in the NOTAM Section. In developing the test, however, FAA officials considered only plaintiff's ability to perform in the domestic side of the Notice to Airmen section.

28. Neither of the individuals who participated in the development of the test had any experience in the development of tests. They had no knowledge of how one develops a valid job-related test. They did not secure available professional advice on how to develop a test from within the agency or from the Office of Personnel Management.

29. The test consisted of reading plaintiff a list of individual pieces of information

which come in by teletype to the NOTAM section, called notice to airmen or "NO-TAMs". Each consisted of a sentence describing a particular aeronautical condition at a particular place and time, e.g., operating hours of the Fort Riley, Kansas tower. Curtis Alms read a series of 15 of these notices to plaintiff without interruption and at a speed of approximately 100 words per minute. Plaintiff was expected to copy the notices to airmen sequentially without error in transcription. Prior to the test, no attempt was made to verify or test it through the use of a control individual or group.

30. The test had a number of very serious deficiencies, including the following: (a) It tested in addition to hearing, the skill of shorthand. Unless one knew some form of shorthand, it was difficult to copy language read at 100 words per minute, the speed at which Mr. Alms read the notices to plaintiff. The federal government requires entry-level stenographers to take shorthand at only 80 words per minute, the same speed as the leading secretarial school in Washington (100 words per minute is considered for an advanced course at that school). Plaintiff noted in his notes his inability to write the NOTAMs down as quickly as they were read. He also objected to the test.

(b) The test was not job-related. The NOTAMs were read sequentially and without interruption, in a form completely unlike the circumstances under which the job would actually be performed. On the job, if an AIS had a question about a NOTAM which arrived by teletype, he would call the originating flight service section on the phone and discuss any clarification he felt was needed. This would be a normal back-and-forth conversation in which any problems could be discussed, cleared up and verified. No such conversations about a particular notice or series of notices was used in the test given to plaintiff; rather, a list was read to be transcribed. Moreover, whereas in an entire eight-hour shift, a specialist will have received 15 NOTAMs which require clarification, here 15 NO-TAMs were read without interruption in a matter of minutes.

(c) The conditions of the test were uncontrolled, without an attempt to ascertain whether the telephone was operating properly.

(d) The text was not validated to determine whether an AIS who was not hearing-impaired could pass.

31. On remand, the agency was also required by the Court to give consideration to reasonable accommodation, but none of the officials involved in the decision was even aware that reasonable accommodation was necessary to plaintiff and apparently all were unsure what it meant. The deciding official, again Mr. Ryan, was unaware that he had to consider reasonable accommodation for plaintiff and did not know how he would go about considering such reasonable accommodations.

32. Neither Mr. Ryan nor Mr. Bancroft were able to say whether any accommodations to plaintiff's handicap were possible in the National Flight Data Center.

33. The Director of Personnel for the Washington headquarters of the FAA, Mr. Driscoll, similarly never considered whether reasonable accommodations were possible for plaintiff, notwithstanding the requirements of the Court's order.

34. Numerous publications of the Office of Personnel Management provide guidance to federal management officials responsible for complying with the duty of reasonable accommodation. These include a Handbook of Reasonable Accommodation, a Handbook of Job Analysis for a Reasonable Accommodation and specific publication concerning Reasonable Accommodation for Deaf Employees in White-Collar Jobs. These publications were not consulted by any FAA officials responsible for the decision not to hire the plaintiff.

35. The evidence demonstrates that, even without any accommodation by the agency, but with the use of a hearing aid which plaintiff has obtained and is willing to use, he may be able to perform the essential functions of the AIS job in the

domestic Notice to Airmen section. Since the other jobs require less use of the telephone, he would be able to do those jobs. The tests performed by the audiologist at the Gallaudet College demonstrate that, in a variety of circumstances, including the introduction of significant background noises, plaintiff can hear and receive messages over the telephone.

36. Alternatively, plaintiff can perform the job of an AIS with reasonable accommodation.

37. It may be that accommodations are possible which would enable plaintiff to perform the job of an AIS in the domestic NOTAM section competently and efficiently, without hazard to anyone.

38. Unfortunately, the "test" conducted by the agency did not have adequate controls. First, as noted, *see* Finding No. 30, the test was given in such a way, that it not only tested hearing, but the skill of the plaintiff in recording the information read over the telephone as well. Nothing in the record indicates that speed writing or shorthand are requirements of the job. Second, the agency did not conduct a controlled test, that is, the agency did not give the test to one or more other persons so as to have the results of those tests as a gauge for the performance of the plaintiff. Third, the agency did not take action to preserve the test, for example, the agency could have recorded the test so that the actual statements of the reader could be played back at a later date. The agency should have recorded the message received over the telephone so that it would have been clear to the finder of fact what the plaintiff should have heard. Such action would also have conclusively established the speed at which the test was given, any problem in the method the NOTAMs were read, any problems with the telephone, and any comments made by the reader and the plaintiff. Such action also may have assisted the agency to determine whether a reasonable accommodation could be made if the plaintiff is assigned to work in the domestic NOTAM section.

39. In the event the plaintiff is unable to "pass" the test, the agency could have considered the accommodation which would be to assign the plaintiff to the international NOTAM section, where little telephone communication is used.

## II

1. At all times relevant to this action, that is, from 1978 to the present, plaintiff has been a qualified handicapped individual within the meaning of Act, 29 U.S.C. § 791, and 29 C.F.R. 1613.702(f).

2. Under FAA regulations, plaintiff's entitlement to "priority consideration" pursuant to the 1977 decision of the agency, entitled him to be considered for the "next appropriate vacancy" defined by regulation as one which (a) would normally be filled by competitive promotion procedures, or by other placement action, including outside recruitment; (b) which is the same grade or level as that to which the employee was not promoted or given proper consideration because of the violation; and (c) which would be acceptable to the employee if selected.

3. To the extent that the FAA, throughout the proceedings in this case, considered plaintiff *only* for a position in the domestic Notice to Airmen section when *it* believed plaintiff was not medically qualified for employment in that section as a result of his hearing loss, the agency has never considered plaintiff for the next "appropriate" vacancy, in violation of the FAA's own regulations, when construed in conjunction with the requirements of the Act.

4. The decision in 1978 not to hire plaintiff violated the Act by discriminating against plaintiff solely on the basis of his hearing loss and his disability retirement, where the selecting official made no attempt to find out the extent of plaintiff's hearing loss or whether that hearing loss interfered with his ability to perform the job.

5. The decision of Bancroft in 1978 not to hire plaintiff was arbitrary and capricious in violation of the APA, because the selecting official made no attempt to find out the extent of plaintiff's hearing loss or

whether that hearing loss interfered with his ability to perform the job.

6. The decision of the FAA in 1980, reaffirmed on reconsideration in 1981, not to hire plaintiff for a position as an AIS violated the Act insofar as it did not consider plaintiff's ability to perform the job with or without reasonable accommodation. This conclusion is the law of the case pursuant to the Court's order of June 29, 1982. *See Crane v. Lewis, supra.*

7. The decision of the FAA in 1980, reaffirmed on consideration in 1981, not to hire plaintiff for a position as an AIS was arbitrary and capricious in violation of the APA insofar as it did not consider plaintiff's ability to perform the essential functions of the job with or without reasonable accommodation, rendered medical conclusions without medical knowledge and deemed plaintiff's evidence irrelevant. This conclusion is the law of the case pursuant to the Court's order of June 29, 1982.

8. The agency's decision on remand from this Court violated the Act in using a test for job performance which was not valid, which was not administered fairly or under controlled conditions and which was not job-related. 29 C.F.R. 1613.705(a).

9. The agency's decision on remand from this Court was arbitrary and capricious under the APA in using a test for job performance which was not valid, which was not administered fairly or under controlled conditions and which was not job-related.

10. The agency's decision on remand from this Court violated the Act by failing to consider reasonable accommodations to plaintiff which would enable him to perform the essential functions of the job of AIS in the domestic NOTAM section, despite a specific order from this Court to consider such accommodations.

11. The agency's decision on remand from this Court was arbitrary and capricious in violation of the APA by failing to consider reasonable accommodations to plaintiff which would enable him to per-form the essential functions of a job of AIS in the domestic NOTAM section.

12. Reasonable accommodations the agency could have considered, and which it is required to consider as a matter of law, include making facilities usable by handicapped persons, 29 C.F.R. 1613.704(b)(1); and modification of equipment or devices, 29 C.F.R. 1613.704(b)(2). The agency never considered any of these possible accommodations.

13. Some of the accommodations proposed by plaintiff could be accomplished without undue hardship on the operation of the agency, considering the size of the National Flight Data Center, the number of employees, the resources of the FAA; the nature of the agency's operation, including the composition and structure of the work force and the nature and cost of the accommodations suggested.

14. As a result of the violation of law described, plaintiff is entitled to back pay to February 1978 at the level of GS-12, with all statutory pay increases, grade increases and promotions.

15. Insofar as plaintiff's hearing loss complaint is concerned, and as a result of the violations of law described, plaintiff is entitled to placement in the position of AIS in the National Flight Data Center, GS-1361-13 in the next vacancy which arises in the Center. Until such vacancy occurs, plaintiff is entitled to "front pay" from the date of the Court's decision to the date of placement in a position.

16. Plaintiff is entitled to reasonable attorney's fees and costs. 29 U.S.C. § 794a(a).

### III

In this part, the Court briefly amplifies what it has stated in Parts I and II. It is clear that the defendants have not complied with the direction given by this Court in *Crane v. Lewis, supra.* The Court noted the difficulty it had in deciding this case on the cross-motions because the agency's decision to reject the plaintiff lacked an evidentiary basis. 551 F.Supp. at 32. It was

for this reason that the case was remanded to the agency with direction that the hearing capability of the plaintiff be tested. In Findings Numbered 30 and 38, Part I, *supra*, the Court has noted the deficiencies apparent in the test given the plaintiff. The Court now concludes that the defendants could have reached a reasonable accommodation by placing the plaintiff in the next appropriate vacancy in the International NOTAM Section. *See Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979); *Treadwell v. Alexander*, 707 F.2d 473 (11th Cir.1983). For this reason, the Court's decision is a final one and a final order has been entered. Notwithstanding this fact, the defendants may give further consideration to placing the plaintiff in the domestic NOTAM section either with or without making an accommodation. In short, the agency may retest the plaintiff one more time having in mind the defects found in the earlier test. If such a test is given, the agency shall "preserve" the test as suggested by the Court. If the plaintiff passes the test, then the agency shall take action to place the plaintiff in the next appropriate vacancy in the domestic NOTAM section. If the plaintiff fails the test, the agency may consider whether there are reasonable accommodations which can be made to permit the plaintiff to work in the domestic NOTAM section. Such accommodations may include, but are not limited to, a phone designed to amplify voices, however, the agency is not required to hire additional personnel or to make scheduling changes which would decrease, in any way, the operations of the important services the agency renders.

The plaintiff brought this action pursuant to the Rehabilitation Act of 1973 and the Administrative Procedures Act. While the Court finds that the agency has acted arbitrarily and capriciously in considering plaintiff's application for employment, the relief it grants is solely based upon that afforded under the Rehabilitation Act of 1973.

An appropriate order has been issued.