RANDOLPH, Circuit Judge,
dissenting:
We should have dismissed this interlocutory appeal. The case arrived here after the district court, on its own motion, certified that an otherwise unappealable order “involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation.” 28 U.S.C. § 1292(b). Another panel directed the parties to brief the *1275 question whether we should exercise our discretion to accept the appeal. See Coopers & Lybrand v. Livesay, 437 U.S. 463, 475, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978). The plaintiff — the American Council of the Blind — opposed the appeal, rightly in my view, on the grounds that the “district court was notably silent as to what remedy it would ultimately order,” that the issue of undue burden is “purely hypothetical” at this stage, that future proceedings might render the issue moot, and that nothing this court could say on the issue would advance the termination of the litigation. Br. for Appellee at 60-61 (citing Control Data Corp. v. International Business Machines Corp., 421 F.2d 323, 325 (8th Cir.1970)). The Secretary agrees that “the question whether specific changes to the currency are unduly burdensome is ‘hypothetical’ because the district court has not yet ordered any particular changes.” Reply Br. for Appellant at 19. As a result, “the question whether [a tactile] feature would be unduly burdensome is not properly before this Court on interlocutory appeal.” Id. Yet the majority plunges ahead to decide issues neither party thinks are before us.
The product of this ill-conceived appeal is proof positive that it should never have been allowed. According to the majority opinion, the Secretary loses because he failed to carry his burden of proving that every possible adjustment — every accommodation — would amount to an “undue burden.” Maj. Op. at 1266. This formulation, and others like it in the opinion, display a fundamental misconception. The Secretary had no burden of the sort the majority describes. To decide on summary judgment that the Secretary violated the Act, there had to be an effective accommodation the government could implement without imposing an “undue burden” on itself or the private sector.[1] And the effectiveness of the accommodation had to be established as an undisputed material fact. Yet with one exception, the district court never specified which of plaintiffs proposals would be effective and neither have my colleagues. The one exception is changing the size of bills according to their denomination.[2] While this might be effective (and might require an Act of Congress),[3] material facts were in dispute regarding the burden of implementing such a system. The government put forth evidence indicating that it would cost billions of dollars to alter private vending machines [4] and ATMs and that rendering current wallets and purses obsolete would impose additional costs. A member of the *1276 plaintiffs Advocacy Services Committee admitted that varying the size of the currency “really does pose an undue burden on business.” Defendant’s Renewed Motion to Dismiss or for Summary Judgment 29 (Aug. 31, 2005). The Rehabilitation Act is not violated if the proposed accommodation imposes an “undue burden,” see Barth v. Gelb, 2 F.3d 1180, 1187 (D.C.Cir.1993), and billions of dollars may well constitute such a burden, even though a good portion of the amount would fall on the private sector. See Am. Pub. Transit Ass’n v. Lewis, 655 F.2d 1272, 1278 (D.C.Cir.1981) (holding that the Rehabilitation Act cannot justify federal regulations that “impose extremely heavy financial burdens on local transit authorities”).
I do not understand my colleagues’ double negative that “[t]he Secretary did not argue, either in the district court or on appeal, ... that tactile features would not enable the visually impaired to denominate bills.” Maj. Op. at 1273. In his opening brief, the Secretary cited a study by the National Academy of Sciences for the proposition that “banknote size that differs with denomination is the only [alteration] applicable to the needs of blind people.” Br. for Appellant at 8. The Secretary went on to argue that embossed dot patterns have “insufficient durability to approximate the average length of time required for notes to remain in circulation.” Id. at 9. He also noted that a study of microperforation by the Bureau of Engraving and Printing found that “individuals with disabilities could not identify the perforation patterns with sufficient accuracy for currency denomination, and analysis also showed that this feature was unlikely to be effective or durable because the perforation pattern could be altered or simulated easily.” Id. at 9-10 (emphasis added). And the Secretary’s reply brief reproduced a study showing that blind testers could not identify 33.8% of Canadian banknotes that had circulated for a year. Reply Br. for Appellant at 21. The same study found a general problem with tactile features: “Diabetes is one of the leading causes of vision loss and is often accompanied by a loss of sensitivity in the fingertips.” Addendum to Reply Br. for Appellant at 5.[5] The Secretary made these arguments before the district court as well.[6] In addition, the Secretary offered evidence to the district court that the ink of an embossed numeral would rapidly rub off during circulation, making this feature useless to the blind. Defendant’s Statement of Material Facts as to Which There Is No Genuine Issue ¶ 63 (Aug. 31, 2005).
In short, my colleagues have not identified a single accommodation that is undis-putedly “reasonable, effective, and feasible,” Maj. Op. at 1265-66, and for which there is no material issue about an undue burden. They do not know what if anything should be implemented as an accommodation and neither does the American Council of the Blind, the Treasury, the district court, or the National Federation of the Blind (who supports Treasury).[7] *1277 Yet my colleagues affirm the grant of summary judgment against the Secretary. In doing so they state that because the Secretary did not show that every possible measure would impose an undue burden, he is barred on remand from showing that any particular measure would have this effect. Maj. Op. at 1272-73, 1274. This cannot possibly be correct. The district court did not believe its ruling meant any such thing and neither did the plaintiff, as its statements quoted earlier demonstrate. Further evidentiary proceedings necessarily must be held before this case can be brought to an end. The case is therefore not even close to being in the proper shape for reasoned appellate decision-making. When faced with “a question of law which turns on a thorough examination of the facts,” we should be “reluctant to rely on what may turn out to be an incomplete record to clarify legal doctrine for the district court’s guidance.” Koehler v. Bank of Bermuda Ltd., 101 F.3d 863, 866 (2d Cir.1996).

. Failure to implement an ineffective accommodation is not a violation of the Rehabilitation Act. See Se. Cmty. Coll. v. Davis, 442 U.S. 397, 409-10, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979).

. Plaintiff also sought “a permanent injunction mandating that [the Secretary] diligently pursue the development of an inexpensive portable electronic device which is capable of both accurate and rapid denomination of banknotes.” First Amended Complaint for Declaratory and Injunctive Relief 36 (Nov. 23, 2005). Such a device might be effective, but there is no evidence that it could be produced at an affordable price.

. Congress has prohibited the Treasury from redesigning the $1 bill, which is why the Council does not seek to change its size. Consolidated Appropriations Act, 2008, Pub.L. No. 110-161, sec. 6, div. D, tit. I, § 113, 121 Stat. 1844, 1978 (2007). If euro banknotes are any guide, progressively increasing the size of American currency from the $1 bill on up would lead to huge bills in the higher denominations. The largest euro banknote (€500) is 40 millimeters longer and 20 millimeters taller than the smallest (€5), yet the $1 bill is already 36 millimeters longer and 4 millimeters taller than the €5 banknote. ECB: Banknotes, http://www.ecb.int/bc/euro/ banknotes/html/index.en.html (last visited May 8, 2008).

.There are approximately 7,000,000 food and beverage vending machines in the United States; by one estimate, it would cost $3.5 billion to retool or replace these machines if the size of different bills were progressively increased.

. Even if the Secretary had not disputed on appeal the effectiveness of various measures, it is absurd to suggest — as the majority does— that the parties’ arguments on the merits somehow constrain our discretion whether to hear the appeal at all.

. E.g., Defendant's Responses to Plaintiffs' Third and Fourth Sets of Interrogatories and First Request for Admissions 1-2 (Aug. 31, 2005). The effectiveness of a foil feature also is uncertain. The 5, 10, and 20 euro banknotes have a foil feature that differs in shape and position from the feature on the 50, 100, 200, and 500 euro banknotes. But no evidence showed that such a feature would enable the blind to distinguish each denomination of American currency.

.During discovery, the Council's complaint explicitly sought only two tactile changes to the currency: “denomination numerals indicated by Braille symbols and raised printing on the banknote itself” and "varying the *1277 length [and] height ... of banknotes.” Complaint for Declaratory and Injunctive Relief 17 (May 3, 2002). The complaint said nothing about microperforation, foil, electronic currency readers, or raised intaglio printing. Although the parties may have mentioned these possible changes during discovery, the Council did not add them to the complaint until three and a half years into the case, after discovery closed. First Amended Complaint for Declaratory and Injunctive Relief ¶ 124 (Nov. 23, 2005).