401 N.W.2d 461 (1987)
224 Neb. 731
FATHER FLANAGAN'S BOYS' HOME, a Nonprofit Nebraska Corporation, Appellee,
v.
Danny GOERKE, Appellant.
No. 85-325.
Supreme Court of Nebraska.
February 20, 1987.
*462 Richard D. Sievers of Marti, Dalton, Bruckner, O'Gara & Keating, P.C., Lincoln, for appellant.
Joseph C. Byam of Byam & Byam, Omaha, for appellee.
Steven E. Guenzel of Barlow, Johnson, DeMars & Flodman, and Cynthia Lehman, Lincoln, for amici curiae Epilepsy Foundation of America et al.
KRIVOSHA, C.J., and BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.
PER CURIAM.
When Father Flanagan's Boys' Home discovered that Danny Goerke was an epileptic, it dismissed him from employment as an assistant family teacher. Goerke filed a charge with the Nebraska Equal Opportunity Commission, alleging that the home discriminated against him, thereby violating the Nebraska Fair Employment Practice Act, Neb.Rev.Stat. §§ 48-1101 through 48-1126 (Reissue 1984). The commission determined that the home had unlawfully discriminated against Goerke and ordered that he be reinstated to his former employment and be paid back wages and benefits. On appeal by the home, the district court reversed the commission's decision. We affirm.
Our standard of review is controlled by the provisions of Neb.Rev.Stat. § 84-918 (Reissue 1981), and we accordingly review the matter de novo on the record. Harris v. Misty Lounge, Inc., 220 Neb. 678, 371 N.W.2d 688 (1985).
Before undertaking that review, however, we sustain the home's motion to strike those portions of the brief filed by the amici curiae, Epilepsy Foundation of America and Epilepsy Association of Nebraska, Inc., which constitute evidentiary material not received in evidence in this case. A brief may not expand the evidentiary record and must limit itself to arguments supported by the record brought to us. See, Raymond v. Department of Motor Vehicles, 219 Neb. 821, 366 N.W.2d 758 (1985); Snyder v. Nelson, 213 Neb. 605, 331 N.W.2d 252 (1983); Neb.Ct.R. of Prac. 9 C(2) (rev. 1986).
In 1966, when he was 7 years old, Goerke suffered a grand mal epileptic seizure, lost consciousness, and experienced convulsions. Therapy involving prescribed medications was commenced and continues to this day. During his youth, Goerke suffered a number of petit mal seizures wherein he experienced a preliminary sense of an impending episode, which was followed approximately 1½ minutes later by a loss of consciousness for approximately 15 seconds. However, Goerke has not experienced a seizure during the last 10 years. Goerke's physician, a neurologist, reported that the condition has been under control since 1973. Goerke rarely forgets his medication, but even on those rare occasions when he has overlooked his medication seizures have not occurred. On especially stressful days, Goerke increases his medication. Epilepsy does not interfere with Goerke's mental processes, concentration, or coordination.
The home provides care for and educates boys ranging from 10 to 19 years of age who are homeless, abandoned, neglected, delinquent, or otherwise disadvantaged, and utilizes school and on-campus homes, which are operated through specially trained, married family teaching couples. Family couples, with their own children, live on the home's campus and are responsible for providing a family environment for the 8 to 10 boys who have been assigned *463 to them. They teach the boys, among other things, self-discipline and socially acceptable living skills, as well as encourage their moral and religious development. An assistant teacher is assigned to assist each couple and to take over when the couple is away from the home. When and for how long an assistant is to take over is a matter negotiated and arranged between the assistant and the particular couple to whom the assistant has been assigned. The assistant does most of the driving required to take the boys to various appointments, activities, and places of employment. The boys themselves are not allowed to drive.
In 1983, Goerke applied for a job as an assistant family teacher at the home. In his written application for employment, Goerke stated that he had no physical handicaps which would impair his ability to perform the job. He so answered because he believed that his history of past seizures would not impair his ability to do the job. When asked about his physical health during one of the six or seven oral interviews the home conducted, Goerke said he was in good health except for a bad knee. The only job qualifications of which he was advised were the requirements that he have a valid driver's license and a high school diploma. Goerke was a high school graduate and possessed a Minnesota driver's license, which he has continually held since the age of 16. Goerke has been involved in two motor vehicle accidents in his lifetime. One accident was a minor collision attributable to icy roads, and the other was a single-car accident when he was a high school student. Neither incident involved any aspect of epilepsy as a factor in the accident.
Goerke had previously worked for 6 months at a juvenile correctional facility for 12- to 18-year-old boys, operated by the State of Minnesota. The facility was located in a relatively isolated area approximately 50 miles from the nearest town. Goerke's duties included assigning the juveniles work duties, monitoring their behavior, and taking care of medical emergencies as a trained emergency medical technician. His duties also required a considerable amount of driving, including transporting juveniles by vehicle into town for medical appointments and other purposes, and obtaining equipment and supplies for the facility. Goerke had no difficulty making such trips.
Goerke was hired by the home and began his job training with a couple to whom he was assigned at the home. According to the schedule negotiated with this couple, Goerke was to work every other weekend, during which time the couple would be away from the home, and, in addition, was to work from 2:30 to 10:30 p.m. 5 days per week. During these periods, Goerke was to assist the operation of a motivational system, oversee the boys' activities, prepare meals as needed, develop relationships with the boys, and assist them. Additionally, he was to drive the boys as circumstances required and to accompany the couple and the household members on trips to Lake Okoboji. Goerke expected to live away from the home and drive to work.
The amount of work-related driving required of an assistant varies from one couple to another. Although there is no evidence as to what percentage of his time Goerke would spend driving, there is evidence that some assistants devote as much as half their employment time to duties in which driving is required.
Goerke was discharged from his employment at the home near the end of his training period and before he had driven any of the boys anywhere. The discharge came about after he asked the couple to whom he had been assigned where he might store his medication. At this point the fact that Goerke suffered from epilepsy was revealed. The home then informed him it had a policy prohibiting epileptics from serving as assistant family teachers. It should perhaps be noted at this point that the parties raise no issue as to whether Goerke was required by law to have a Nebraska driver's license. See Neb.Rev. Stat. §§ 60-403 and 60-410 (Reissue 1984). The home offered Goerke employment in *464 its maintenance or custodial departments, but nothing was available with duties whereby he could work directly with the boys, as Goerke desired.
Although the home had no written policy on epilepsy as such, it determined in 1980 that, as a result of epileptic seizures sustained by some of its employees, staff members with histories of epileptic seizures should not be allowed to transport the boys. The only memoranda concerning this policy were the individual communications to the various epileptics informing them of such decision. The written job description for assistants did not mention epilepsy as a disqualifying condition. The home's policy was described as a "blanket exclusion for all individuals who had a known history of seizures," but the home had not screened employees to determine who was suffering from epilepsy. At the hearing, the home did not present any evidence that epileptics in general, and Goerke in particular, were unable to perform the duties of an assistant family teacher.
Section 48-1104 of the Nebraska Fair Employment Practice Act provides in relevant part that it "shall be an unlawful employment practice for an employer: (1) To ... discharge any individual ... because of such individual's ... disability...."
Section 48-1102(8) defines disability as including epilepsy or seizure disorders "unrelated to such person's ability to engage in a particular occupation."
Additionally, § 48-1111(1) provides that it shall not be an unlawful employment practice for an employer to deny privileges of employment "when the nature and extent of a disability reasonably preclude the performance of the particular employment."
In a discrimination suit brought under the provisions of § 48-1104 of the Nebraska Fair Employment Practice Act, the following is the procedure to be followed in presentation of evidence relevant to a question about discrimination against a disabled person: First, the complainant has the burden of proving a prima facie case of discrimination. Second, if the complainant succeeds in proving that prima facie case, the burden shifts to the respondent to articulate some legitimate, nondiscriminatory reason for the employee's rejection or discharge from employment. Third, should the respondent carry the burden, the complainant must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the respondent were not its true reasons, but were a pretext for discrimination. See Harris v. Misty Lounge, Inc., 220 Neb. 678, 371 N.W.2d 688 (1985). See, also, McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Zalkins Peerless Co. v. Nebraska Equal Opp. Comm., 217 Neb. 289, 348 N.W.2d 846 (1984).
The first question to be decided, then, is whether Goerke has proved a prima facie case of discrimination against a person with a disability within the Nebraska Fair Employment Practice Act. Goerke may prove his prima facie case by showing:
(1) that he is a member of a protected class within the meaning of the Nebraska Fair Employment Practice Act, §§ 48-1101 et seq.; (2) that he is qualified for the position of employment sought; (3) that he applied for and was rejected [or discharged from] that position; and (4) that after he was rejected [or discharged] the job remained open.
Williams v. Goodyear Tire & Rubber Co., 219 Neb. 748, 751, 366 N.W.2d 132, 135 (1985). See, also, McDonnell Douglas Corp. v. Green, supra, 411 U.S. at 802, n. 13, 93 S.Ct. at 1824, n. 13 ("The facts necessarily will vary in [discrimination] cases, and ... the prima facie proof required... is not necessarily applicable in every respect to differing factual situations").
Under § 48-1101, "disability" designates a protected class regarding employment in Nebraska. By virtue of § 48-1102(8), "epilepsy" is included within the definition of a "disability," but only if such *465 epilepsy is "unrelated to such person's ability to engage in a particular occupation."
The record conclusively establishes that Goerke is an epileptic. In order to be within a protected class, however, Goerke must establish that his condition was unrelated to his ability to perform employment duties and did not adversely affect his carrying out the responsibilities of an assistant teacher.
Goerke's evidence is that his condition has been under control by medication for at least 10 years and that he had, at least for a short time, successfully performed for another employer some of the duties required by the home. The evidence also establishes, however, that the dosage Goerke requires depends upon the amount of stress he encounters and that he does, quite humanly, occasionally forget to take his medicine. The Nebraska Fair Employment Practice Act does not require the home to risk the safety of the boys for whom it is responsible on the assumption that Goerke has not forgotten to take his medication and that he has accurately forecast the amount of stress he will encounter and has properly adjusted his dosage.
It is self-evident that transporting boys produces varying degrees of stress, depending upon the presence of a number of variables, such as weather, road, traffic, and mechanical conditions, and the behavior of one's passengers. The fact Goerke has not yet had a seizure while transporting others does not require the home to risk the safety of the boys in its charge on the basis of trial and error, and thereby invite and await disastrous results.
We note that the U.S. Department of Transportation regulation found at 49 C.F.R. § 391.41(b)(8) (1985) disqualifies epileptics from operating motor carriers in interstate commerce. While we recognize that the Department of Transportation regulation does not apply to the home, the regulation's existence nonetheless demonstrates that the department considers epileptics unsuited to be commercial motor vehicle operators. See Costner v. United States, 720 F.2d 539 (8th Cir.1983). While there are undeniable differences between commercial interstate driving and the driving duties of an assistant family teacher for the home, the safety concerns are nonetheless similar.
Thus, we conclude that Goerke's epilepsy is not unrelated to his ability to engage in the home's occupation of assistant family teacher and that the nature of epilepsy is such as to reasonably preclude performance of that employment. That being so, Goerke has failed to prove that he is within a protected class and thus has failed to prove a prima facie case of discrimination.
The judgment of the district court being correct, it is affirmed.
AFFIRMED.
SHANAHAN, Justice, dissenting.
If facts and law are disregarded, today's decision may become acceptable.
Before receipt of his driver's license at age 16, Goerke held a farm permit issued by the State of Minnesota and operated farm machinery, tractors, trucks, cars, and pickups used in agricultural operations. Later, when employed at Thistledew, a Minnesota correctional facility with 53 boys and a capacity of 70, Goerke frequently drove a van or station wagon to transport boys, ages 12 to 18, from Thistledew to neighboring towns, sometimes involving trips in excess of 100 miles. As noted by the majority, Goerke's duties at Thistledew "required a considerable amount of driving." In April 1983 Goerke came to Boys Town because he saw an opportunity to advance his career and to take additional courses at a local university. Three weeks after Goerke started his job, and without any intervening incident detrimental to the home, Boys Town discharged him from employment when the home learned about Goerke's epilepsy. As additional background, reflected in the majority's opinion, Goerke has not experienced an epileptic episode during the last 10 years, even when he may have overlooked taking medication, and epilepsy "does not interfere with *466 Goerke's mental processes, concentration, or coordination."
The Legislature has clearly expressed the public policy which is the foundation of the Nebraska Fair Employment Practice Act:
It is the policy of this state to foster the employment of all employable persons in the state on the basis of merit regardless of their race, color, religion, sex, disability, or national origin, and to safeguard their right to obtain and hold employment without discrimination because of their race, color, religion, sex, disability, or national origin. Denying equal opportunity for employment because of race, color, religion, sex, disability, or national origin is contrary to the principles of freedom and is a burden on the objectives of the public policy of this state....
Neb.Rev.Stat. § 48-1101 (Reissue 1984).
Through the Nebraska Fair Employment Practice Act, the Legislature has sought to secure to the disabled full and equal access to employment, based on merit and bounded only by the actual disability which an employee or potential employee may be unable to overcome. Employment discrimination, attributable to a classification based solely on an individual's disability rather than ability, is "peculiarly repugnant in a society that prides itself on judging each individual by his or her merits." Andersen v. Exxon Co., 89 N.J. 483, 491, 446 A.2d 486, 490 (1982). A disability, by itself, is not a permissible basis to assume that an individual is unable to function in a particular context. Southeastern Community College v. Davis, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979).
However, Neb.Rev.Stat. §§ 48-1102(8) and 48-1111(1) (Reissue 1984) of the Nebraska Fair Employment Practice Act secure to the employer freedom to reject an applicant for employment or discharge an employee when such individual is unable to perform the duties imposed by the particular employment because that individual is generally unqualified for the employment or has a disability which actually impedes or prevents adequate job performance. See Andersen v. Exxon Co., supra.
Concerning the Nebraska Fair Employment Practice Act and unlawful discrimination based on disability, the question is whether the nature and extent of an individual's disability reasonably preclude adequate performance of the particular job. See, Andersen v. Exxon Co., supra; Foods, Inc. v. Iowa Civil Rights Commission, 318 N.W.2d 162 (Iowa 1982); Silverstein v. Sisters of Charity, 43 Colo.App. 446, 614 P.2d 891 (1979).
In view of Goerke's work and medical history, buttressed by the evidence from the neurologist who was Goerke's attending physician, Goerke, although an epileptic, was able to perform the exact job from which he was discharged. Goerke has proved he is a member of a protected class and has, therefore, established a prima facie case of employment discrimination condemned by the Nebraska Fair Employment Practice Act.
Whatever has prompted the majority to refer to regulations of the U.S. Department of Transportationregulations which the majority readily acknowledges are inapplicable to Boys Townremains without suitable explanation and cogent correlation. The federal regulations pertain to drivers of 18-wheelers, semis, tremendous trucks, and other motorized mammoths moving for protracted periods as common carriers in interstate commerce. The "undeniable differences between commercial interstate driving" and Goerke's driving duties at Boys Town annihilate any possible relevance regarding those federal regulations which, in relation to this case, are reduced to bureaucratic bunkum.
The majority's opinion apocalyptically announces: "The fact that Goerke has not yet had a seizure while transporting others does not require the home to risk the safety of the boys in its charge on the basis of trial and error, and thereby invite and await disastrous results." To the majority, it is absolutely inevitable that Goerke, an epileptic, will cause "disastrous results" in employment such as that at Boys Town.
*467 The facts do not warrant such awesome augury. Only a conclusion contradictory to the prognostication of the majority is deducible from facts presented to this court.
One objective of the antidiscrimination provision of the Nebraska Fair Employment Practice Act is prohibition of employment discrimination resulting from unfounded stereotyping of persons disabled by some physical or mental handicap. That objective is, as yet, unrealized. Today, epileptics; tomorrow, diabetics; thereafter...?
KRIVOSHA, C.J., and WHITE, J., join in this dissent.