Audry WOOD, and Ella Mae
Whitcomb, Plaintiffs,

v.

SCHOOL DISTRICT OF OMAHA, the Nebraska Department of Motor Vehicles, and the Nebraska Department of Education, Defendants.

No. CV 88–0–489.

United States District Court,
D. Nebraska.

Feb. 26, 1992.

Mary P. Clarkson, Broom, Johnson, Fahey & Clarkson, Omaha, Neb., for plaintiffs.

Don Stenberg, Atty. Gen., Harold Mosher, Sr. Asst. Atty. Gen., Lincoln, Neb., John P. Heil, Baird, Holm, McEachen, Pedersen, Hamann & Strasheim, Omaha, Neb., for defendants.

**MEMORANDUM OPINION
AND ORDER**

CAMBRIDGE, District Judge.

This matter is before the Court on the Defendants' motion for summary judgment on the issue of reasonable accommodation, (Filing No. 60), the Plaintiffs' cross-motion for summary judgment on the issue of reasonable accommodation, (Filing No. 63), and the Defendants' cross-motion for summary judgment on the issue of reasonable accommodation, (Filing No. 66). The Court has considered the evidentiary material and briefs submitted by the parties.[1]

## I. FACTUAL BACKGROUND

The following facts are included in the uncontroverted facts in the order on pretrial conference, (Filing No. 49):

1. Plaintiff Audrey Wood was born on August 13, 1948 and was employed by Defendant School District of Omaha ("SDO") as a van driver to transport school children for almost eight years prior to 1986;

2. In 1981 Wood was diagnosed as suffering from diabetes mellitus.[2] Prior to 1986 Wood underwent and successfully completed physical examinations necessary to obtain annual school bus driver permits;

3. Plaintiff Ella Mae Whitcomb was born on March 10, 1946 and was employed by SDO as a van driver to transport school children for two years prior to 1986;

4. In 1982 Whitcomb was diagnosed as suffering from diabetes mellitus. Prior to 1986 she underwent and successfully completed physical examinations necessary to obtain annual school bus driver permits;

5. Plaintiffs are residents of Omaha, Douglas County, Nebraska;

6. Defendant SDO is a political subdivision of the State of Nebraska which provides education and related services to resi-

---

1. The declaration of George F. Cahill, Jr., M.D. (Filing No. 35) has previously been stricken (Filing No. 59).

2. "Diabetes mellitus" is defined as "a metabolic disease in which carbohydrate utilization is re-

duced and that of lipid and protein enhanced. It is caused by deficiency of insulin and is characterized, in more severe cases, by glycosuria, water and electrolyte loss, ketoacidosis, and coma." *Illustrated Stedman's Medical Dictionary* 388 (5th unabridged lawyers' ed. 1982).

dents of the school district. SDO hires and supervises school van drivers. Said drivers are involved in transporting special education students as well as students who are transported pursuant to special transfers;

7. SDO receives federal financial assistance for its program of transporting special education students. Defendant Nebraska Department of Education ("NDE") also receives federal financial assistance for its programs;

8. On May 1, 1986 a memorandum was issued to Nebraska Superintendents of Schools by the Defendant Nebraska Department of Motor Vehicles ("DMV") and the NDE announcing changes in school bus and van driver physical examination requirements, testing, and issuance of permits. The changes took effect on June 1, 1986. A copy of the then new physical examination form, DMV 06-37 was attached to the memorandum, (Filing No. 35, Ex. 1 to Ex. 5);

9. DMV 06-37 requires the examining physician to certify that the applicant driver has been found qualified under the United States Department of Transportation physical qualifications set forth on the reverse side of DMV 06-37 and taken from the Federal Motor Carrier Safety Regulations, 49 C.F.R. § 391.41 to -.49 (1990); [3]

10. In October of 1986, the Plaintiffs were examined by their respective treating physicians;

11. In November or December of 1986, the Plaintiffs presented their forms DMV 06-37 to examiners at the DMV driver test-

---

**3.** The DMV 06-37 is captioned with the words "physical examination form" and "meets Department of Transportation requirements." In completing a section entitled "Health History," the examining physician is to check either a "Yes" or a "No" box next to the word "Diabetes" and, if the "Yes" box is checked the physician is to "explain." The physician is to fill in information reflecting a physical examination and certain laboratory tests. The physician is directed to check a box if the applicant is "not qualified," and a space is provided for "general comments." At the very bottom of the form is space for the medical examiner which is to be completed only if the applicant is determined by the examining physician to be qualified. The medical examiner's certificate provides that the medical examiner has examined the applicant and found the applicant qualified, assuming knowledge of the pertinent job duties, under the Federal Motor Carrier Safety Regulations, 49 C.F.R. § 391.41 to -.49 (1990) (Filing No. 35, Ex. 1 to Ex. 5).

On the reverse side of the form appears the caption "Dept. of Transportation Physical Qualifications & Examinations of Drivers." Pertinent sections provide:

A person is physically qualified to drive a motor vehicle if he—

. . . .

(3) *Has no established medical history or clinical diagnosis of diabetes mellitus currently requiring insulin for control;*

. . . .

INSTRUCTIONS FOR PERFORMING AND RECORDING PHYSICAL EXAMINATIONS

The examining physician should review these instructions before performing the physical examination. Answer each question yes or no where appropriate.

The examining physician should be aware of the rigorous physical demands and mental and emotional responsibilities placed on the driver of a commercial motor vehicle. In the interest of public safety the examining physician is required to certify that the driver does not have any physical, mental or organic defect of such a nature as to affect the driver's ability to operate safely a commercial motor vehicle.

*General information.* The purpose of this history and physical examination is to detect the presence of physical, mental or organic defects of such a character and extent as to affect the applicant's ability to operate a motor vehicle safely. The examination should be made carefully and at lease [sic] as complete as indicated by the attached form. History of certain defects may be the cause for rejection or indicate the need for making certain laboratory tests or a further, and more stringent, examination. Defects may be recorded which do not, because of their character or degree, indicate that certification of physical fitness should be denied. However, these defects should be discussed with the applicant and he should be advised to take the necessary steps to insure correction, particularly of those which, if neglected, might lead to a condition likely to affect his ability to drive safely.

. . . .

*Diabetes. If insulin is necessary to control a diabetic condition, the driver is not qualified to operate a motor vehicle. If mild diabetes is noted at the time of examination and is stabilized by use of a hypoglycemic drug and diet that can be obtained while the driver is on duty, it should not be considered disqualifying. However, the driver must remain under adequate medical supervision.*

(*Id.* (emphasis added)). A reading of the entire section on the reverse side of the form indicates that the overriding concern is the ability of the applicant to "control and safely drive a motor vehicle." (*Id.*).

ing station in Omaha, Nebraska, and DMV examiners refused to issue either Plaintiff a permit to operate a school bus or van;

12. On or about December 15, 1986 SDO terminated the Plaintiffs' services as van drivers and transferred them to positions as van aides which involved a lower rate of pay;

13. There exists no record of performance problems caused by the Plaintiffs' medical conditions of diabetes mellitus for the years when Plaintiffs were employed as van drivers by SDO, (Filing No. 49).

The Plaintiffs' position is that the Defendants' actions in transferring the Plaintiffs to positions as van aides violate the Rehabilitation Act of 1973 ("Rehabilitation Act" or "Act"), 29 U.S.C. § 794. The Plaintiffs challenge the Defendants' actions relating to the change in the terms and conditions of the Plaintiffs' former positions as school van drivers on the basis of their medical conditions—diabetes mellitus.[4] The Plaintiffs request monetary damages as well as injunctive relief.

The Defendants argued in previously filed motions for summary judgment, (Filing Nos. 35 and 43), that no genuine issue of material fact existed regarding the inability of the Plaintiffs to safely perform the essential functions of school van drivers in accordance with the Federal Motor Carrier Safety Regulations, 49 C.F.R. § 391.41 to -.49 (1990), and that the only feasible attempt to modify the position of school van driver to accommodate the Plaintiffs' needs would impose undue hardship on Nebraska school operations. The Plaintiffs argued in their previously filed cross-motion for summary judgment, (Filing No. 58), that they are able to safely perform the essential functions of school van drivers and that a simple accommodation is available which would not alter the fundamental duties of the job or impose undue hardship on Nebraska school operations.

In denying both parties' motions for summary judgment, the Court determined that the Plaintiffs are "handicapped" within the meaning of the Rehabilitation Act. In determining whether the Plaintiffs, as insulin-using diabetics, are otherwise qualified to be employed as school van drivers, the Court determined that the following material fact remained in dispute: whether reasonable accommodations exist which do not require the modification of the essential nature of the program and which do not place undue burdens on the recipient of federal funds. The Court also encouraged the parties to explore the possibility of the existence of such reasonable accommodations. (Filing No. 59).

The Defendants then moved for summary judgment on the issue of reasonable accommodation. (Filing No. 60). The Plaintiffs then filed a cross-motion for summary judgment on the same issue. (Filing No. 63). Finally, the Defendants filed their cross-motion for summary judgment on the same issue—essentially a response to the Plaintiffs' cross-motion. (Filing No. 66).

## II. STANDARD OF REVIEW

Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party should prevail as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleadings but must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). However, the opposing party must be given the benefit of all favorable factual inferences and summary judgment cannot be granted when the non-movant shows that an allegedly undisputed fact actually presents a triable issue. *Holloway v. Lockhart*, 813 F.2d 874, 878 (8th Cir.1987).

## III. DISCUSSION

█ The elements of a cause of action brought pursuant to § 504 of the Rehabili-

4. Both plaintiffs are Type–II, non-insulin-dependent diabetics as opposed to Type I, insulin-dependent diabetics. Both plaintiffs are, however, among the approximately twenty percent of Type II diabetics treated with insulin as opposed to oral hypoglycemic agents. Therefore, the plaintiffs are hereinafter referred to as "insulin-using" or "insulin-treated" diabetics.

tation Act are that a plaintiff is: 1) a handicapped person under the Act; 2) otherwise qualified to participate in the employment or activity in question; 3) being excluded from participation in, being denied the benefits of, or being subjected to discrimination solely by reason of the handicap; and 4) that the relevant program or activity receives federal financial assistance. *Doherty v. Southern College of Optometry,* 862 F.2d 570, 573 (6th Cir.1988), *cert. denied,* 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989).

In this case the focus is solely on the second inquiry, that is whether the Plaintiffs, as insulin-using diabetics, are otherwise qualified to be school van drivers. The Plaintiffs bear the burden to make at least a facial showing that they are "otherwise handicapped" individuals, that is, whether they, with reasonable accommodations, are able to perform the requirements of their jobs despite their handicaps. *Arneson v. Heckler,* 879 F.2d 393, 396 (8th Cir.1989).

█ The Supreme Court has stated that an "otherwise qualified" individual is one "who is able to meet all of a program's requirements in spite of" that individual's handicap. *Southeastern Community College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979). In addition, in determining whether one is "otherwise qualified," a court is required to consider the risk of harm to the handicapped individual as well as to other persons. *Gardner v. Morris,* 752 F.2d 1271, 1284 (8th Cir.1985); 29 C.F.R. § 1613.702(f) (1990).

█ Assuming that the Plaintiffs meet their burden, the burden then shifts to the Defendants to show that they are unable to accommodate the Plaintiffs. *Arneson,* 879 F.2d at 396. Discrimination may arise, for example, in a situation in which there is an unreasonable refusal to modify an existing program to accommodate the needs of a disabled person. *Davis,* 442 U.S. at 412–13, 99 S.Ct. at 2370. The Supreme Court discusses two factors which relate to the reasonableness of a refusal to accommodate a handicapped individual. First, re-quiring accommodation is unreasonable if it requires modification of the essential nature of the program. And second, requiring accommodation is unreasonable if it would place an undue burden, i.e. cost, on the recipient of federal funds. *Id.* at 410, 412, 99 S.Ct. at 2369, 2370.

Turning to the case before this Court, the purpose of the SDO van program is the safe transportation of school children between home and school. 23 C.F.R. § 1204.4 No. 17 (1990) (providing minimum requirements for state highway safety programs for pupil transportation safety, including the operation of vehicles used to transport school children); Neb.Rev.Stat. § 79–328(13) (Cum.Supp.1990) (providing that the powers and duties of the state board of education include the safe operation of vehicles used to transport school children).

## A. THE REHABILITATION ACT AND IMPLEMENTING REGULATIONS

Section 504 of the Rehabilitation Act of 1973, as amended, provides:

No *otherwise qualified individual with handicaps* in the United States, as defined in section [706(8)], shall, *solely by reason of her or his handicap,* be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency.

29 U.S.C. § 794(a) (emphasis added). In defining an individual with handicaps, the Act, as amended, provides:

(8) (A) Except as otherwise provided in subparagraph (B), the term "individual with handicaps" means any individual who (i) has a physical or mental disability which for such individual constitutes or results in a substantial handicap to employment and (ii) can reasonably be expected to benefit in terms of employability from vocational rehabilitation services provided pursuant to titles I and III of this Act.

(B) ... [T]he term "individual with handicaps" means, for purposes of titles IV and V of this Act ... any person who (i) has a physical or mental impairment which substantially limits one or more of such person's life activities, (ii) has a record of such impairment, or (iii) is regarded as having such an impairment. *Id.* § 706(8)(A)–(B). "Major life activities" are defined as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, *working*, and receiving education or vocational training." 29 C.F.R. § 32.3(b)(3) (1990) (emphasis added); 45 C.F.R. § 84.3(j)(2)(ii) (1990) (listing essentially the same activities, and including "working").

Whenever an employer demotes a handicapped employee because of job qualifications related to that individual's handicap, the relevant job qualifications "shall be related to the specific job ... and shall be consistent with business necessity and *safe performance*. The [employer] shall have the burden to demonstrate that it has complied with th[ese] requirements." 29 C.F.R. § 32.14(b) (1990) (emphasis added).

## B. FEDERAL MOTOR CARRIER SAFETY REGULATIONS AND PROPOSED AMENDMENTS THERETO

The Federal Highway Administration ("FHWA"), Department of Transportation ("DOT") is authorized to establish minimum driver qualification requirements for drivers of commercial motor vehicles in interstate commerce, a category including truck driving and intercity passenger transportation. 55 Fed.Reg. 41028 & 41033 (1990). Presently, the standard adopted by the FHWA prohibits all "insulin-using diabetics," *id.* at 41028, from driving commercial motor vehicles in interstate commerce. 49 C.F.R. § 391.41(b)(3) (1990) (providing that "[a] person is physically qualified to drive a motor vehicle if that person—[h]as no established medical history or clinical diagnosis of diabetes mellitus currently requiring insulin for control").[5] Section 391.-

41(b)(3) was based on a concern for public safety and on the belief that individual determinations of risks to public safety posed by insulin-using diabetics cannot reliably be made. 55 Fed.Reg. 41028 (1990).

The FHWA, through its proposed amendments to chapter III, subchapter B of the Code of Federal Regulations, which includes § 391.41(b)(3), seeks to balance the risk posed to public safety without unreasonably restricting employment opportunities. The FHWA has recognized advances made in the treatment and management of diabetes and now believes that reliable, case-by-case assessments of insulin-using individuals' abilities to safely operate a non-passenger-carrying commercial motor vehicle in interstate commerce are possible. The FHWA now proposes that insulin-using diabetics be qualified to drive non-passenger-carrying commercial motor vehicles in interstate commerce after completion of a medical examination pursuant to minimum procedures set forth by the FHWA and that drivers be subject to certain restrictions. The FHWA recognizes that the success of this approach depends on the responsibility assumed by examining physicians and the insulin-using diabetic's commitment to self-monitoring and control of the disease. *Id.*

The proposed regulation, in pertinent part, provides as follows:

§ 391.41 **Physical Qualifications for Drivers.**

\*   \*   \*   \*   \*   \*

(b) A person is physically qualified to drive a commercial motor vehicle if that person—

\*   \*   \*   \*   \*   \*

(3)(i) Has no established medical history or clinical diagnosis of diabetes mellitus likely to interfere with that person's ability to safely operate a commercial motor vehicle and provided a person who requires insulin for control of the disease—

(A) Has been examined by a board-certified endocrinologist under the medi-

---

**5.** The phrase "person requiring insulin for control" used in 49 C.F.R. § 391.41(b)(3) (1990) has

been interpreted by the FHWA as synonymous with the phrase "insulin-using diabetic." *See id.*

cal evaluation procedures in paragraph (b)(3)(ii) of this section;

(B) Has within the last five years:

(1) An absence of a hypoglycemic reaction that resulted in loss of consciousness or seizure;

(2) An absence of seizure or coma without antecedent prodromal symptoms of hypoglycemia; and

(3) An absence of recurrent diabetic ketoacidosis or hyperosmolar nonketotic coma;

(C) *May not operate a commercial motor vehicle designed to transport more than 15 passengers, including the driver,* or a commercial motor vehicle transporting hazardous materials ...;

(D) Returns to the driver's normal work reporting location each work day; and

(E) Complies with the conditions set forth in paragraph (b)(3)(iii) of this section.

55 Fed.Reg. 41036 (1990) (emphasis added) (to be codified at 49 C.F.R. § 391.-41(b)(3)(i)(A)–(E) (——)). Further proposed amendments to the current regulations provide for: the provision of certain information to the examining physician performing the medical examination in accordance with 49 C.F.R. § 391.43 (1990), as amended; procedures to be followed by the examining physician and a board-certified endocrinologist; and monitoring and reevaluation procedures to be followed by the insulin-using diabetic. *Id.* at 41036–37 (to be codified at 49 C.F.R. § 391.41(b)(3)(ii) & (iii) (——)).

Emphasized above in the proposed regulation is the statement that the proposal precludes an insulin-using diabetic from operating commercial motor vehicles designed to carry more than fifteen passengers, including the driver. This provision appears to relate to vehicle design as opposed to the ability to actually transport passengers, as additional information provided by the FHWA indicates an unwillingness at this time to allow insulin-using diabetics to operate passenger-carrying commercial motor vehicles in interstate commerce:

[I]nsulin-using diabetics, if found to be qualified, would be permitted to operate CMVs, *other than passenger carrying CMVs* and CMVs laden with hazardous materials....

. . . .

.... The driver's authorization to drive would be limited to *exclude the driving of passenger carrying and hazardous materials laden vehicles* ....

. . . .

While the FHWA believes that a person found qualified in accordance with the procedures spelled out in this proposal will not pose an unacceptable risk to public safety, certain limitations are proposed until more experience is obtained with these drivers. *These drivers will not be permitted to operate passenger carrying or hazardous materials laden vehicles.* These limitations are the same as those originally imposed on limb-handicapped drivers. While these limitations were eventually deleted from the limb-handicapped driver waiver program based on experience, *the FHWA believes that the additional risks involved in passenger and hazardous materials transportation should be avoided by insulin-using diabetics at this time.*

55 Fed.Reg. 41034–35 (emphasis added).[6]

## C. SUMMARY OF THE EVIDENCE

### 1. MEDICAL EVIDENCE

The evidence in this case includes a deposition of William C. Duckworth, M.D., Chief of Diabetes, Endocrinology and Metabolism in the Department of Internal Medicine at the University of Nebraska Medical Center. Dr. Duckworth has never examined the Plaintiffs, and he has not looked at the Plaintiffs' medical records or histories. Rather, Dr. Duckworth based his responses to hypotheticals or assumptions posed by counsel. (Filing No. 58, Ex. E at 18:20–24). Dr. Duckworth opined that, based on the information provided to him by counsel, the Plaintiffs are Type II diabetics. (*Id.* at 15:19–22), and as such their risk of a hypoglycemic reaction is "considerably less"

---

**6.** "CMVs" refers to commercial motor vehicles.

than the risk born by Type I diabetics, (*Id.* at 32:13–19). Dr. Duckworth stated that, in his opinion, a Type II diabetic should not be disqualified from driving a school bus or van. (*Id.* at 25:12–13; 29:8–13; 32:20–25). In order to make that determination, Dr. Duckworth believes that it is necessary to examine an individual and to view that individual's medical records and medical history. (*Id.* 36:18–37:1).

In an additional affidavit, Dr. Duckworth stated that he understands that the Plaintiffs are among a group consisting of approximately twenty percent of Type II diabetics who are treated with insulin and that the Plaintiffs' conditions require daily injections of insulin. (Filing No. 60, ¶ 3). Dr. Duckworth stated that any diabetic treated with insulin is at risk for developing hypoglycemia, which is a condition of low blood glucose concentrations arising from an imbalance between carbohydrate intake and insulin availability. Dr. Duckworth stated that the onset of hypoglycemia can be sudden and not necessarily perceived by the diabetic. (*Id.* ¶¶ 5, 10). Dr. Duckworth emphasized the seriousness of the risk of hypoglycemia in insulin-treated diabetics who operate motor vehicles. Dr. Duckworth indicated that even moderate degrees of hypoglycemia may impair color vision, prolong reaction times, slow cortical activity and cause neuropsychological deterioration, resulting in an unpredictable effect on a driver's ability to control the motor vehicle. Dr. Duckworth also indicated that severe hypoglycemia can result in loss of consciousness or death, which can in turn result in a vehicular accident. (*Id.* ¶¶ 6–7). Dr. Duckworth opined that "[t]he degree of risk or frequency of hypoglycemia in diabetics treated with insulin depends on many variables and cannot [presently] be predicted with reasonable medical certainty." (*Id.* ¶¶ 8, 9 & 12). Dr. Duckworth stated that a blood prick test administered immediately before driving a motor vehicle cannot eliminate the risk of hypoglycemia in an insulin-treated diabetic. The reason provided in support of Dr. Duckworth's opinion is that due to the continuing action of the injected insulin, the diabetic's blood glucose level can drop from a normal level to a hypoglycemic level in as little as one hour. (*Id.* ¶ 9). Moreover, Dr. Duckworth opined that because "complications of diabetes" can delay stomach-emptying and food absorption, hypoglycemic diabetics might not respond to ingested foods and fluids for a period of time. Therefore, Dr. Duckworth opined that the availability to an insulin-treated diabetic of food and drink may not completely eliminate the risk of hypoglycemia. (*Id.* ¶ 10). Dr. Duckworth opined that, even if an insulin-treated diabetic driving a motor vehicle were to perceive the early symptoms of hypoglycemia while driving, the driver would have to safely park the vehicle in order to take in food or drink. Then the driver should remain parked for ten to thirty minutes until the hypoglycemia abates and the driver could safely proceed. (*Id.* ¶ 11).

Dr. Duckworth stated that an insulin-treated diabetic whose blood glucose level is maintained at a normal or near-normal level is at a greater risk of experiencing hypoglycemia than an insulin-treated diabetic whose blood glucose level is maintained at an above-normal level. Maintaining blood glucose at an above-normal level is likely, however, to increase the possibility of long-term complications for the diabetic. Therefore, Dr. Duckworth cautions that an insulin-treated diabetic should not be required to maintain an above-normal level of blood glucose in order to reduce the risk of hypoglycemia. (*Id.* ¶¶ 14–15).

The evidence also includes affidavits of Robert E. Ratner, M.D., Associate Professor of Endocrinology and Metabolism, Department of Medicine at George Washington University Medical School and the Director of the George Washington University Diabetes Center. (Filing No. 58, Ex. A; Filing No. 43). Dr. Ratner has not examined the Plaintiffs; he has, however, examined their medical records and clinical histories. (Filing No. 58, Ex. A). Based on his examination of the Plaintiffs' records, Dr. Ratner stated that the Plaintiffs are Type II diabetics "who do not require insulin for treatment of their diabetes" but who do

require insulin to treat their high blood sugars. (*Id.* ¶¶ 2–3).

In another affidavit, Dr. Ratner opined that individuals diagnosed as Type II diabetics should be evaluated individually to determine whether they are able to drive school buses or vans. (Filing No. 43, ¶ 9). Dr. Ratner opined that, given the Plaintiffs' medical records and histories and the "relative stability of their schedules, even if a condition should occur requiring them to miss a full noon or evening meal, the risk of hypoglycemia could be lowered to zero by the reasonable accommodation of their employer allowing them to carry with them during work hours and ingest if necessary, a cup of whole milk and a sandwich." (*Id.* ¶ 27).

In a subsequent affidavit, Dr. Ratner stated that he agrees with the amendments proposed by the Department of Transportation to the Federal Motor Carrier Safety Regulations, 49 C.F.R. § 391.41 to −.49 (1990), and also that he believes the measures proposed therein would reduce the risk of the Plaintiffs in experiencing hypoglycemia which would affect their "behavior, cognition, or ability to safely drive a motor vehicle." (Filing No. 63, Ex. A, ¶ 3). Dr. Ratner opined that a reasonable accommodation by the Defendants in this case would consist of the steps set forth in the proposed regulation, including a blood glucose concentration test performed by the Plaintiffs or a physician authorized by the Defendants one hour prior to driving and every four hours while driving. Dr. Ratner also suggested that in the event the Plaintiffs are unable to be tested while driving that they should carry and eat a carbohydrate snack. Dr. Ratner opined that these measures would result in "no reasonable probability of substantial harm to the Plaintiffs or others while they performed their jobs." (*Id.*). Dr. Ratner stated that severe hypoglycemia is somewhat predictable in that persons likely to suffer severe hypoglycemia have had a past history of similar episodes. (*Id.* ¶ 6). Dr. Ratner failed, however, to address the predictability of moderate hypoglycemia. Dr. Ratner then stated that hypoglycemia most frequently occurs in Type I diabetics, and that because the Plaintiffs are Type II diabetics who are obese, without histories of hypoglycemia, and consistently have above-normal blood sugar levels, that the Plaintiffs' risk and frequency of hypoglycemia is "considerably less." (*Id.* ¶ 7). In so testifying, however, the Court assumes from the context of the affidavit that Dr. Ratner so referred only to severe hypoglycemia as opposed to both moderate and severe hypoglycemia. Dr. Ratner stated that he was the chair of a subcommittee which provided supplemental information for rulemaking action relating to insulin-treated commercial motor vehicle drivers in interstate commerce,[7] (*Id.* ¶ 8 & Ex. A), and he emphasized the importance of the individualized, case-by-case analysis employed in the proposed amendment to § 391.41(b)(3). (*Id.* ¶ 11–12).

Dr. Ratner disagrees with several of Dr. Duckworth's conclusions. Specifically, Dr. Ratner, as opposed to Dr. Duckworth, asserts that: a blood glucose test before driving can reduce the risk of hypoglycemia while driving to virtually zero; the difficulty of stomach-emptying and food absorption is a diagnosable and treatable disorder not evidenced in the medical records or history of either Plaintiff; that stopping and parking the vehicle upon noticing early symptoms of hypoglycemia would be an unlikely necessity as it is possible to prevent hypoglycemia over a two-to four-hour span and because drivers receive a break after four hours; that the frequency of hypoglycemia can be predicted as between Type I and Type II diabetics; and that Dr.

---

**7.** The report submitted by the subcommittee provides, among other things, that "[c]ertification of all eligible applicants with insulin-treated Type II diabetes would result in 175–5085 additional projected accidents due to hypoglycemia or an increase of 0.4–12.9%." (*Id.* Ex. A at 15). The subcommittee noted that this projected increased rate of accidents due to hypoglyce-

mia, however, presumed no selection of drivers on the bases of glycemic control, history of unconscious hypoglycemic reactions or participation in educational programs, and that such factors "may result in substantial lowering in the frequency of hypoglycemia" and resulting accidents. (*Id.* Ex. A at 15).

Duckworth's caution that an insulin-treated diabetic should not be required to maintain an above-normal level of blood glucose in order to reduce the risk of hypoglycemia is inapplicable to the Plaintiffs. (*Id.* ¶¶ 14–22).

The evidence also includes an affidavit of Byron Randolph, M.D., the treating physician for Plaintiff Audry Wood. Dr. Randolph stated that he has diagnosed Ms. Wood as experiencing "Type II non-insulin dependent diabetes mellitus" treated with insulin "primarily to prevent the late development of diabetes-related complications." (Filing No. 58, Ex. C, ¶ 2). Dr. Randolph stated that it would be "very unusual" for her to become hypoglycemic. (*Id.* ¶ 3). When Dr. Randolph completed the DMV 06–37, he checked the "diabetes" box, as an explanation wrote "diabetic," indicated that he found Ms. Wood qualified, and did not indicate that Ms. Wood was an insulin-dependent diabetic. (*Id.* ¶ 4 and Attachment).

The evidence includes affidavits of Satish K. Mediratta, M.D., treating physician for Plaintiff Ella Mae Whitcomb since 1982. (Filing No. 58, Exs. B and D). Dr. Mediratta stated that Ms. Whitcomb had been treated with oral hypoglycemic agents until 1983 when she developed uncontrolled diabetes mellitus which did not respond to the oral agents. (Filing No. 58, Ex. B, ¶ 1). In 1983 she was hospitalized for her condition which resulted in high blood sugar, fluctuating between 200 and 500. (*Id.* ¶ 3). In order to " 'control' " her diabetes by keeping her blood sugar below 200 and to prevent long-term complications, Dr. Mediratta has prescribed insulin injections. (*Id.* ¶ 4). When Dr. Mediratta completed the DMV 06–37 for Ms. Whitcomb, he checked the box labeled "diabetes," noted that Ms. Whitcomb had "insulin dependent diabetes mellitus," and indicated that she was qualified to drive a school van. (*Id.* Ex. D Attachment). Although Dr. Mediratta indicated when he completed the DMV 06–37 for Ms. Whitcomb that she was qualified to drive a school van, Dr. Mediratta admitted that as he interprets the form, since he has prescribed insulin to control Ms. Whitcomb's diabetes he had to check the box

labeled diabetes and therefore Ms. Whitcomb could not be considered qualified according to the Federal Motor Carriers Safety Regulations, 49 C.F.R. § 391.41 to -.49 (1990). (*Id.* Ex. B ¶ 6). Dr. Mediratta explained that when he stated on the form that Ms. Whitcomb was an insulin-dependent diabetic, he used that phrase to mean that she was being treated with insulin rather than that she was a Type I diabetic. (*Id.* Ex. D ¶ 3 and Attachment).

While both treating physicians completed the DMV 06–37 forms indicating that the Plaintiffs were qualified to drive school vans, however, both treating physicians indicated that under the Federal Motor Carriers Safety Regulations, 49 C.F.R. § 391.41 to −.49 (1990), referred to in DMV 06–37, the Plaintiffs are not qualified for such positions.

In summary, the medical evidence shows that the Plaintiffs, as Type II insulin-using diabetics, are at risk for developing hypoglycemia, albeit a lower risk than that experienced by a Type I diabetic. Moderate hypoglycemia can result in vision impairment, prolonging of reaction times, and other neural activity which might result in an unpredictable effect on a driver's ability to control a motor vehicle. Severe hypoglycemia can result in loss of consciousness or even death. The medical evidence shows the uncertainty of the following: the degree to which the risk of hypoglycemia can be reduced through administration of a blood glucose test before driving; the length of time over which hypoglycemia can be prevented; and the degree of frequency with which hypoglycemia can be predicted among insulin-using diabetics. The medical evidence also shows, absent selection of insulin-using diabetics due to control, history or education, that the accident rate among Type II, insulin-using diabetics would increase the accident rate among drivers at a rate between 0.4 and 12.9%.

### 2. NONMEDICAL EVIDENCE

The Plaintiff Ms. Wood has submitted an affidavit in which she stated that she

worked as a standby driver for the Omaha Public Schools Student Transportation Division from March, 1979 to December, 1981 and as a regular van driver driving a regular route from December, 1981 through 1986. As a standby driver, Ms. Wood was ready to answer calls from 6:00 a.m. but regularly reported to work from 10:00 a.m. to 2:00 p.m. to drive children throughout the district on an as-needed basis, e.g., from school to home because of illness or to and from different schools for special services. (Filing No. 68, Ex. D ¶ 3). As a regular driver, Ms. Wood followed a schedule similar to that followed by Ms. Whitcomb. (*Id.* ¶ 2). Ms. Wood stated that as both a standby and regular driver, she always had breaks and could eat if necessary, never missed a full lunch between 12:00 p.m. and 2:00 p.m., and never experienced a hypoglycemic reaction while working as a van driver or aide. (*Id.* ¶¶ 4–7).

In her supplemental affidavit, Ms. Wood stated that while she believes she could carry food and drink to be ingested if necessary, that at no time during her employment as a van driver has it been necessary for her to eat other than during scheduled breaks and lunch times. (*Id.*, Ex. B ¶¶ 2–3). Ms. Wood stated that she would be willing to undergo the type of medical examination set forth in the proposed DOT regulation, but that as she cannot afford the cost of the examination that the cost should be covered by the Defendants. (*Id.* ¶ 5). Ms. Wood also stated that she is willing to perform, or submit to performance by a physician or other agent authorized by the Defendants, a blood glucose test within an hour before driving and approximately every four hours while driving. Ms. Wood also stated that she would abide by the self-treatment measures set out in the regulation, including the ingestion of an appropriate snack if circumstances preclude blood glucose testing. (*Id.* ¶ 6).

Ms. Whitcomb submitted an affidavit in which she stated that she was a regular school van driver for the Omaha Public Schools Student Transportation Division from November, 1984 through December, 1986 and since December, 1986 has worked as a van aide. Her typical schedule both as a regular van driver and as a van aide is as follows:

6:00 a.m.—take insulin

6:30 a.m.—eat breakfast

7:00 a.m.—report for work at the Plant . . .

7:00 a.m. to 9:30 a.m.—drive morning route

9:30 a.m. to 11:30 a.m.—break

11:30 a.m. to 1:00 p.m.—drive noon route

1:00 p.m.—eat lunch

2:30 p.m. to 4:20 p.m.—drive afternoon route

4:20 p.m.—return to Plant and then go home

6:30 to 7:00 p.m.—eat supper

7:30 to 8:00 p.m.—take insulin

(*Id.* Ex. C ¶ 3). The only disruption in her schedule that Ms. Whitcomb recalls having experienced was early dismissal due to hot weather and, in that situation, Ms. Whitcomb was still able to eat her lunch at her usual time during a 1:00 p.m. break. (*Id.* ¶¶ 4–5). Ms. Whitcomb testified that she recalled no time during her employment as either a van driver or van aide when winter conditions or dismissal times caused her to delay or miss her usual lunch or evening meal. (*Id.* ¶ 7). Ms. Whitcomb stated that she "habitually" carries with her a piece of fruit for a snack if she is hungry, and that her schedule always allowed her to eat a snack whenever she "was hungry in mid morning or in the afternoon." (*Id.* ¶ 8). Ms. Whitcomb testified that she never experienced a hypoglycemic or hyperglycemic reaction "while working as a van driver or van aide." (*Id.* ¶ 10).

In her supplemental affidavit, Ms. Whitcomb stated that while she believes she could carry food and drink to be ingested if necessary, that at no time during her employment as a van driver has it been necessary for her to eat other than during scheduled breaks and lunch times. (Filing No. 63, Ex. C, ¶¶ 2–3). Ms. Whitcomb stated that she would be willing to undergo the type of medical examination set forth in the proposed DOT regulation, but that as she cannot afford the cost of the examination that the cost should be covered by the

Defendants. (*Id.* ¶ 5). Ms. Whitcomb also stated that she is willing to perform, or submit to performance by a physician or other agent authorized by the Defendants, a blood glucose test within an hour before driving and approximately every four hours while driving. Ms. Whitcomb also stated that she would abide by the self-treatment measures set out in the regulation, including the ingestion of an appropriate snack if circumstances preclude blood glucose testing. (*Id.* ¶ 6).

The evidence includes an affidavit of Allan R. Williams, Director of Transportation of the Omaha Public Schools ("SDO"). (Filing No. 35, Ex. 1). Mr. Williams described the schedules of SDO bus and van drivers and their general duties. He testified that drivers' routines can fluctuate drastically because of either weather or traffic conditions. For example, Mr. Williams stated that a delay at the end of the day could result in the completion of a route as late as 7:00 p.m. as opposed to 5:00 p.m. Mr. Williams also stated that "it is not uncommon" for SDO drivers to miss one or more meals or snacks because of weather or traffic conditions and that a driver may not leave a bus or van unattended for any reason. He stated that "[a]n essential aspect to the van or bus driver's job is the ability to operate their vehicle without leaving the vehicle or obtaining assistance from other persons for substantial periods of time." (*Id.* ¶ 8). Mr. Williams pointed out that in the event a driver would lose consciousness, there would be a substantial risk of injury to the driver, the student passengers, bystanders and drivers and passengers of other vehicles. It was his opinion that "the only way to accommodate a van or bus driver who poses a risk of sudden and unexpected unconsciousness, confusion or disorientation, or who needs to consume a meal to avoid such a risk would be to assign a second driver to the vehicle. Such an assignment would place an undue hardship on the District's student transportation operations." (*Id.* ¶ 10).

A summary of the nonmedical evidence indicates that while the Plaintiffs may not have up until this time experienced disrup-

tions in their schedules requiring them to miss meals, that such disruptions are not unusual. The nonmedical evidence also shows that a van driver operates without additional assistance and that if a driver is delayed that such delay affects the driver's subsequent schedule in picking up or delivering students.

## D.  REASONABLE ACCOMMODATIONS

The Plaintiffs propose as one reasonable accommodation the testing and monitoring procedures set out in the FHWA's proposed amendment to regulation § 391.41, including: the use of a blood glucose test before driving; subsequent blood glucose tests every four hours; and ingestion of an appropriate snack in the event it becomes impossible to complete one of the subsequent tests. The Plaintiffs propose as an additional reasonable accommodation that the Plaintiffs be allowed to carry with them during work hours and to ingest a cup of whole milk and a suitable food snack in the event of a hypoglycemic reaction.

The Court, however, finds that these proposed accommodations are insufficient, for the reason that the job of a school van driver cannot reasonably be altered to eliminate the actual, substantial risk that a mild or severe hypoglycemic reaction poses to either a driver or the schoolchildren who would be van passengers. *See* 55 Fed.Reg. 41034–35 (relating to the proposed DOT regulation, stating that "the FHWA believes that the additional risks involved in passenger ... transportation should be avoided by insulin-using diabetics at this time"); *cf. Commonwealth of Pennsylvania v. Tinsley,* 128 Pa.Cmwlth.Ct. 594, 564 A.2d 286 (1989) (affirming the lower court's reinstatement of a school bus driver's license in the case of a diabetic using oral hypoglycemic medication, as opposed to insulin, where the driver would undergo a blood glucose test each day before driving and abide by additional conditions related to such testing). The Court finds that the only accommodation which would guarantee the safety of the Plaintiffs and the schoolchildren who would be their van pas-

sengers would be to assign additional drivers to the vans operated by the plaintiffs. This alternative would constitute an unreasonable financial hardship on the Defendants in funding the program. Therefore, this alternative does not constitute a "reasonable accommodation." *See Chiari v. City of League City*, 920 F.2d 311, 317 (5th Cir.1991) (stating that "under section 504, an individual is not qualified for a job if there is a genuine substantial risk that he or she could be injured or could injure others, and the employer cannot modify the job to eliminate that risk"); *Davis v. Meese*, 692 F.Supp. 505, 510, 511, & 519–20 (E.D.Pa.1988) (concluding that a blanket exclusion excluding diabetics other than those controlling their condition by diet or diet together with oral hypoglycemic medications from positions as special agents and investigative specialists with the Federal Bureau of Investigation does not violate § 504 of the Rehabilitation Act, where the plaintiff's proposed accommodations would impose an undue hardship on the FBI program), *aff'd*, 865 F.2d 592 (1989). The Court therefore finds that no reasonable accommodations exist which can be implemented in the situation presented to the Court.

## E.  CONCLUSION

The Court recognizes that great strides are being made in the medical field insofar as the control and treatment of diabetes is concerned, as evidenced by the FHWA's proposed amendment to § 391.41. 55 Fed. Reg. 41027–37. The Court views the Plaintiffs' arguments relating to the proposed version of § 391.41 relating to drivers of commercial motor vehicles in interstate commerce with great caution, however. The reasons for the caution exercised by the Court are that the Plaintiffs' arguments relate to a *proposed* version of § 391.41 and also that the FHWA, in proposing an amended version of § 391.41 recognizes that at this time insulin-using diabetics who are in effect using insulin to control their diabetes are to be precluded from driving passenger-carrying vehicles. *Id.* Although no case law now exists relating to a Type II, insulin-using diabetic challenging a blanket exclusion of insulin-using diabetics from being school bus or van drivers, existing statutory and case law directs that this Court, in deciding the issues before this Court balance the genuine, substantial risk of harm that a mild or severe hypoglycemic reaction in a Type II, insulin-using diabetic poses in relation to the element of safety required of a school van driver. The Court is of the opinion that the safety of the Plaintiffs and the schoolchildren who would be their van passengers cannot be compromised. This opinion is based on the present state of the law and medical science.

At this time, therefore, under existing law the Court finds that the motions for summary judgment on the issue of reasonable accommodation are to be determined in favor of the Defendants and that this decision requires that judgment be entered in favor of the Defendants and against the Plaintiffs.

IT IS ORDERED:

1. The Defendants' motion for summary judgment on the issue of reasonable accommodation, (Filing No. 60), is granted;

2. The Plaintiffs' cross-motion for summary judgment on the issue of reasonable accommodation, (Filing No. 63), is denied;

3. The Defendants' cross-motion for summary judgment on the issue of reasonable accommodation, (Filing No. 66) is granted;  and

4. Judgment shall be entered for the Defendants and against the Plaintiffs.