

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-20-1994

# Easley v. Snider, et al.

Precedential or Non-Precedential:

Docket 94-1199

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

## Recommended Citation

"Easley v. Snider, et al." (1994). *1994 Decisions.* Paper 138.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/138

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

_____

NO.  94-1199
_____

TRACY EASLEY, by her next friend,
LUCILLE EASLEY; FLORENCE H.

v.

KAREN SNIDER, Secretary of the Department of
Public Welfare; KAY ARNOLD, Deputy Secretary
for Social Programs; HOMEMAKER SERVICES OF THE
METROPOLITAN AREA

Karen Snider and Kay Arnold,
Appellants

_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. No. 93-cv-00221

_____

Argued July 18, 1994
Before:  SCIRICA, LEWIS, and ROSENN, Circuit Judges
Opinion Filed September 22, 1994

_____

ERNEST D. PREATE, JR., ATTORNEY GENERAL
SUSAN J. FORNEY, SENIOR DEPUTY ATTORNEY GENERAL (Argued)
KATE L. MERSHIMER, SENIOR DEPUTY ATTORNEY GENERAL
JOHN G. KNORR, III, CHIEF DEPUTY ATTORNEY GENERAL
Office of Attorney General
15th Floor, Strawberry Square
Harrisburg, PA  17120
  Attorneys for Appellants

ILENE SHANE, ESQUIRE
ROBIN RESNICK, ESQUIRE
Disabilities Law Project
801 Arch Street, Suite 610
Philadelphia, PA  19107

STEPHEN F. GOLD, ESQUIRE (Argued)
Suite 700

125 South Nine Street
Philadelphia, PA 19107
    Attorneys for Appellees

_____

OPINION OF THE COURT

ROSENN, Circuit Judge.

This appeal, involving important legal and societal questions, arises out of an attack on the legality of the Pennsylvania Attendant Care Services Act (Care Act), 62 P.S. § 3051 et seq. (Supp. 1994). Pennsylvania enacted this legislation in 1986 as a program designed to enable physically disabled persons to live in their homes rather than institutions and, when possible, to become active and useful members of society.

The plaintiffs, Tracey Easley (Easley) and Florence Howard (Howard), both rejected as ineligible for the program, brought suit in the United States District Court for the Eastern District of Pennsylvania, alleging that the Care Act conflicts with the more recently enacted Americans with Disabilities Act of 1990 (ADA or Act), 42 U.S.C.A. 12101 et seq. (Supp. 1994),[1] because the Care Act requires that candidates for the program also be mentally alert. Plaintiffs sought to enjoin the State of Pennsylvania from excluding them from the program. Following a bench trial, the district court concluded that the program developed under the Care Act violated the ADA and enjoined the

_____

[1]. These proceedings assert claims under Title II of the ADA. The district court exercised jurisdiction pursuant to 28 U.S.C. § 1331. This court has jurisdiction as the appeal is from a final order within the meaning of 28 U.S.C. § 1291.

State from excluding Easley and Howard from receiving attendant care services.  The State appeals.  We reverse.

I.

The Care Act authorized the Pennsylvania Department of Public Welfare (PDPW) to provide attendant care services to eligible individuals.  The General Assembly declared its purpose in enacting the law was to enable physically disabled but mentally alert adults between the ages of eighteen and fifty-nine to live in their own homes and communities.  Additionally, they must:

1.  experience a physical impairment expected to last a continuous period of at least 12 months;

2.  be capable of selecting, supervising and, if needed, firing an attendant;

3.  be capable of managing their own financial and legal affairs; and,

4.  because of their physical impairment, require assistance to complete the functions of daily living, self-care, and mobility.

62 P.S. § 3053.  Persons who are physically disabled but not mentally alert are excluded from the program.

A. Tracey Easley and Florence Howard

At the time of trial, Easley was a twenty-nine year old woman tragically disabled by a catastrophic car accident in 1982, just as she was to begin her sophomore year at Vassar College.  Easley suffered a closed head injury which left her with minimal mobility and without speech.  She apparently can communicate with her family by blinking her eyes and using other facial

expressions.  Presently, Easley is unable to care for herself and cannot be left alone.  Easley is not capable of selecting, supervising, or firing an attendant, or managing her own financial and legal affairs.

In 1987, Easley resided in West Philadelphia, and through the use of a surrogate, in this case her mother, applied for and received attendant care services from Resources for Living Independently (RLI) which was under contract with the PDPW.  Easley moved in 1991 to an area not serviced by RLI but by Homemaker Services Metropolitan Area, Inc (HSMA), which was also under contract with PDPW.

At the time of trial plaintiff Howard was a fifty-three year old woman with multiple sclerosis and undifferentiated schizophrenia.  Howard is immobile from the waist down and, due to her condition, cannot live alone.  Howard lived with her daughter until September 1991, but entered the Philadelphia Nursing Home when her daughter could not obtain attendant care services for her.

Howard has expressed dissatisfaction with her present situation.  She wants to leave the nursing home and live in the community.  To do this, she would need PDPW-funded attendant care services.  PDPW, however, determined Howard ineligible under the Act because she was not mentally alert.  Without using a surrogate, Howard is incapable of selecting, supervising or discharging an attendant and is not capable of managing her own financial and legal affairs.

Pennsylvania's Attendant Care Program determined the plaintiffs to be ineligible for its services because they were not capable of hiring, supervising and, if needed, firing an attendant and because they are not capable of personally controlling their own legal and financial affairs.  Both plaintiffs alleged that defendant Karen Snider, Secretary of the PDPW, and defendant Kay Arnold, the Deputy Secretary for PDPW's Office of Social Programs (OSP) which administers the Attendant Care program, violated the ADA by denying them attendant care services because they were not "mentally alert."  Easley and Howard challenge the provision of the Care Act that requires the participants to be mentally alert.

### B.  THE ATTENDANT CARE PROGRAM

The General Assembly stated the policies in pertinent part underlying the Care Act were as follows:

1.  The increased availability of attendant care services for adults will enable them to live in their own homes and communities.

2.  Priority recipients of attendant care services under this Act shall be those mentally alert but severely physically disabled who are in the greatest risk of being in an institutional setting.

3.  Recipients of attendant care have the right to make decisions about, direct the provision of and control their attendant care services. This includes but is not limited to hiring, training, managing, paying and firing of an attendant.

62 P.S. at § 3052.

The Care Act defines attendant care services as "[t]hose basic and ancillary services which enable an individual to live in his home and community, rather than in an institution, and to carry out functions of daily living, self-care and mobility."  Id. at § 3053.  Basic services include assistance with getting in and out of bed, a wheelchair, or a car and also include assistance with routine bodily functions such as health maintenance activities, bathing and personal hygiene, dressing, grooming, and feeding.  Id.  Certain ancillary services may be provided which include homemaker services such as shopping, cleaning and laundry, companion-type services such as transportation, letter writing, reading mail, and escort, and assistance with cognitive tasks such as managing finances, planning activities, and making decisions.  Id.

The PDPW contracts with various agencies to provide attendant care services pursuant to the Act and Department guidelines.  The Department requires that the agencies offer three models of service delivery: the consumer model, the agency model, and the combination model.  Under the consumer model the consumer advertises, interviews, hires, and fires the attendant. The consumer submits invoices to the respective agencies and receives money so that the consumer is responsible for the task of paying the care giver for his or her services.  Under the agency model, the agency employs the attendant, but the consumer retains the right to reject an attendant that the consumer considers unsuitable.  The consumer provides direction in developing the service plan and retains the responsibility for

supervising the attendant in the home.  Under the combination model, the consumer selects certain tasks to be performed and certain tasks the agency will perform.  The consumer has the responsibility to choose the service delivery model that he/she most prefers.  PDPW describes the combination model as "a menu with the consumer selecting what tasks he or she will do and what tasks the agency will do."

## II.

We must determine if the targeting of the programmatic services to physically disabled but mentally alert individuals is permissible or whether the State improperly excluded Easley and Howard from receiving attendant care services.  We make this determination by examining the essential nature of the program to discover whether mental alertness is a necessary eligibility requirement and whether Easley and Howard can satisfy this requirement with a reasonable modification, here by using a surrogate.  In reviewing this appeal, the court exercises a plenary standard of review when applying legal precepts to undisputed facts.  Midnight Sessions, Ltd. v. Philadelphia, 945 F.2d 667, 671 n.1 (3d Cir. 1991), cert. denied, 112 S.Ct. 1668 (1992).

### A.  "Mental Alertness" Under The Care Act.

We begin our analysis with the passage of the ADA. Congress enacted the ADA to eliminate discrimination against handicapped individuals by extending the non-discrimination principles required at institutions receiving federal funds by the Rehabilitation Act, 29 U.S.C.A. § 790 et seq. (Supp. 1994),

to a much wider array of institutions and businesses, including services provided by states and municipalities. 42 U.S.C.A. § 12101 et seq. Title II of the ADA provides:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall by reason of such disability be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

Id. at § 12132.

The State's reading of the ADA and its supporting regulations is one which enables a state to provide a particular class of disabled persons with benefits and services without obligating itself to extend the same services and benefits to other classes of persons with disabilities. The regulations implementing the ADA define a "qualified individual with a disability" as:

> An individual with a disability who, with or without reasonable modifications to rules, policies, or practices, . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

28 C.F.R. § 35.104 (1993). Another regulation implementing the ADA specifically endorses a state's authority to offer benefits to specific classes of persons with disabilities:

> Nothing in this part prohibits a public entity from providing benefits, services, or advantages to individuals with disabilities, or to a particular class of individuals with disabilities beyond those required by this part.

Id. at § 35.130(c).  Further, the preamble also authorizes a state to design programs for particular groups of disabilities.

The preamble reads in part:
> State and local governments may provide special benefits, beyond those required by non-discrimination requirements of this part that are limited to individuals with disabilities or a particular class of individuals with disabilities, without incurring additional obligations to other classes of persons with disabilities.

App. A., 28 C.F.R. Ch.I Pt 35 (1993).


The State asserts that in addition to the Care Act's consistency with the regulations implementing the ADA, the Care Act is consistent with the regulations implementing the Rehabilitation Act, 29 U.S.C.A. § 794, the ADA's forerunner.

These regulations state in part:
> The exclusion of non-handicapped persons from the benefits of a program limited by Federal statute or executive order to handicapped persons or the exclusion of a specific class of handicapped persons from a program limited by Federal statute or executive order to a different class of handicapped persons is not prohibited by this part.

45 C.F.R. § 84.4(c) (1993) (emphasis added).

The district court rejected the State's position and accepted the contentions of Easley and Howard that the prerequisite of mental alertness is just the sort of discrimination that the ADA intended to prevent and concluded that such a criterion contravenes the regulations implementing

the Act.  The court relied on an ADA regulation which states in relevant part:

> A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with a disability from fully and equally enjoying any service program or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.

28 C.F.R. § 35.130(b)(8) (emphasis added).

The district court refused to accept the State's characterization of the program and, in its own examination of the essential nature of the program, the court determined that it is not necessary to be mentally alert to receive attendant care services.  The court did not view consumer control and independence as essential elements of the program, but rather merely two of the many opportunities the program provides.

In Southeastern Community College v. Davis, 442 U.S. 397 (1979), the Court first examined § 504 of the Rehabilitation Act, the predecessor of the ADA.  There, after a deaf woman was denied admission into a federally-funded nursing program, the Court was asked to decide whether § 504 prohibited physical requirements in admission to professional schools.  Id. at 400. In concluding that § 504 did not forbid such requirements, the Court held that the woman, who could not understand aural communication without reading lips, was not "otherwise qualified" for admission to the program because "[a]n otherwise qualified person is one who is able to meet all of a program's requirements

in spite of his handicap." Id. at 406.    In then examining the physical requirements to determine whether modifications had to be made so that no discrimination against handicapped individuals occurred, the Court concluded that no elimination of requirements was necessary because to do so would fundamentally alter the program, something not required under the Rehabilitation Act. Id. at 408, 409 n.9.

Interpreting the Court's decision in Southeastern Community College, we stated in Strathie v. Department of Transportation, 716 F.2d 277, 231 (3d Cir. 1983):

> A handicapped individual who cannot meet all of a program's requirements is not otherwise qualified if there is a factual basis in the record reasonably demonstrating that accommodating that individual would require either a modification of the essential nature of the program, or impose an undue burden on the recipient of federal funds.

It follows, of course, that if there is no factual basis in the record demonstrating that accommodating the individual would require a fundamental modification or an undue burden, then the handicapped person is otherwise qualified and refusal to waive the requirement is discriminatory.  Therefore, when determining whether a program discriminates, a court must determine two things:  (1) whether the plaintiff meets the program's stated requirements in spite of his/her handicap, and (2) whether a reasonable accommodation could allow the handicapped person to receive the program's essential benefits.  Further, when determining an accommodation would allow the applicant to receive the benefit, a court cannot rely solely on the stated benefits

because programs may attempt to define the benefit in a way that "effectively denies otherwise handicapped individuals the meaningful access to which they are entitled . . . ." Alexander v. Choate, 469 U.S. 287, 300 (1984).

The district court reviewed this case law and concluded that if mental alertness is not necessary, "then these plaintiffs are qualified to receive the service despite their lack of mental alertness." The district court's statement, therefore, can only be interpreted to mean that unless removing the mental alertness criteria would be an unreasonable accommodation, i.e., "would require either a modification of the essential nature of the program, or impose an undue burden on the recipient of federal funds," the State would have to drop the requirement. Consequently, the dominant issue presented here is whether mental alertness is part of the essential nature of the program. See Alexander, 469 U.S. at 287 n.19. If mental alertness is not part of the program's essential nature, the plaintiffs are qualified and the State is required to accommodate them. Likewise, if mental alertness is not part of the program's essential nature, the accommodation is, by definition, reasonable.

The PDPW Manual asserts that the purpose of the program is "to allow the physically disabled to live in the least restrictive environment as independently as possible, to remain in their homes and prevent inappropriate institutionalization, and to seek and/or maintain employment." The district court noted that an analysis of the "service[s] actually being offered" is necessary to determine the essential nature of the program,

slip op. at 11-12, but seemed to forego that examination and instead relied merely on the foregoing excerpt of the program manual. Consequently, it determined that providing these stated benefits was the essential nature of the program, and held that any physically disabled person whose disability did not prevent them from receiving these benefits was qualified.

In so holding, the court rejected the State's claim that consumer control was part of the essential nature of the program requiring mental alertness as an eligibility criterion. The court found that consumer control merely provided the State with an opportunity to service the recipients, and that the State had not proven it was "necessary for the services to be provided, or for the benefits to be received." Id. at 20. As evidence that consumer control is unnecessary to receive the essential benefits of the program, the court cited the agency model of care in which "mentally alert individuals are fully empowered to relinquish consumer control." Id. at 21. In essence, the court reasoned that if the consumer does not need the ability to hire, fire, and supervise an attendant under each mode of care, then mental alertness cannot be essential to participation in the program.

An examination of the actual services offered demonstrates that personal control is essential to the program, and that mental alertness is a necessary requirement for receipt of the program's essential benefit rather than merely a service to benefit recipients. The record indicates that contrary to the court's characterization of the agency model, program

beneficiaries do not relinquish personal control in any of the attendant care models. Paula Jean Howley, supervisor for PDPW Attendant Care Programs, testified at trial how the consumer retains personal control under the agency model. The purpose of the program has as its well-defined goal the provision of greater personal control and independence for the physically disabled. To achieve the programmatic goal, the physically disabled obviously cannot function independently and exercise personal control of their lives if they are not mentally alert. Hence, the joinder of this requirement cannot be attributable to discrimination, rather, it is "necessary for the provision of the . . . program or activity being offered."

The argument submitted by Easley and Howard and adopted by the district court mischaracterizes the Attendant Care Program. The State intended that the delivery of services to the physically disabled preserve their independence, recognizing that without their physical limitations, they would be running their own lives. The district court's definition of living independently as "the opportunity to remain in the community or family home rather than an institution" is drastically different than the definition of the creators of the program. The difference is obvious when one considers that the third purpose of the program is to enable the physically disabled to seek and maintain employment. The State strives for a level of independence that allows an individual to become an active, contributing member of society, a level of independence obviously greater than one which does nothing more than keep and sustain

persons out of institutions. Mental alertness of the physically disabled who participate in the program is an essential dimension without which the objectives of the program cannot be realized.

The goals intended to elevate the lives of the physically disabled bear some resemblance to the State's earlier goals to alleviate the lot of another class of handicapped, the mentally disabled and retarded, when it enacted the comprehensive Mental Health and Retardation Act in 1966, 50 P.S. § 4102 et seq. This legislation endeavored to deinstitutionalize, insofar as possible, the State's mental health and retardation centers and set up whenever possible County Mental Health and Retardation Boards with programs at the county and community levels. The Care Act is another progressive program by the State to improve the lot and lives of many physically disabled by providing opportunities for personal independence and employment. See Knutzen v. Eben Ezer Lutheran Housing Center, 815 F.2d 1343, 1353-54 (10th Cir. 1987) (Rehabilitation Act was intended to serve as a helping hand and not "as a 'sword' with which the handicapped may carve a share from every federal benefit program").

Final support for our view is an independent evaluation of the program conducted in 1985 and 1986 by The Conservation Company and The Human Organization Science Institute, Villanova University, at the behest of the PDPW. As the report demonstrates, Pennsylvania's Attendant Care legislation followed a number of similar programs adopted by other states. Associations of handicapped persons (e.g., United Cerebral Palsy,

Disabled in Action, Pennsylvania Alliance of Physically Handicapped) actively urged legislators to begin attendant care. A Final Report of an Evaluation of the Pennsylvania Attendant Care Demonstration Program, Vol. 1, p.5. The report also observes that the role of attendants differs from that of traditional aides or homemakers. Under this program, the attendant is directed by the handicapped individual and performs a wide range of tasks for the physically disabled person. This enables physically disabled persons to

> better control their lives and reach maximum independence when they are able to direct their own personal care and manage their home, business, and social lives. Attendant Care in Pennsylvania continues to be seen as part of the wider independent living movement whose fundamental goals are to enable the physically disabled to: a) maintain a less restrictive and/or independent living arrangement; b) maintain employment; and/or c) remain in their homes.

Id. at 4. These concerns were later incorporated in the policy declaration of the Care Act, cited by the State in support of its position. 62 P.S. § 3052(3), see page 5 supra.

An important part of Easley and Howard's argument that mental alertness is not a necessary prerequisite to receiving attendant care services is based on their analogy between the use of surrogates by consumers and clients who use the "agency" or "combination" models offered by the program. This comparison both overstates the control Easley and Howard exercise over their own lives and understates the role of the clients in the agency and combination models of service delivery. In the agency model,

the consumer must supervise the attendant and the service plan and may reject the attendant at any time. In the combination model, the consumer must designate tasks he/she will perform and assign tasks to the agency. All three models require, at the very least, that the consumer make a decision as to the best form of service delivery. The choice of any service model is very different from a surrogate making the decision for the consumer. Allowing a decision by a surrogate is at complete odds with the program objectives.

Accordingly, we hold that mental alertness is a necessary prerequisite to participation in the attendant care program. Although we appreciate the contentions by the plaintiffs of the benefits Easley and Howard could derive from this program, this unfortunately is insufficient to carry out the purposes sought to be accomplished by the legislature. Again, the Care Act's policy declaration and the Independent Report to PDPW explain that the essential nature of the program is to foster independence through consumer control for individuals who, but for their physical disabilities, could manage their own lives, achieve independence, and perhaps obtain employment. As such, mental alertness of the participants is a prerequisite.

This does not end the matter, however, as we must determine whether the use of surrogates as decision-makers for non-mentally alert consumers is a reasonable modification under the Care Act.

B. Reasonable Modifications Under the Care Act

The reasonable modification provision of the regulations implementing the ADA requires:

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the services, program, or activity.

28 C.F.R. § 35.130 (b)(7).  Easley and Howard argue that even if mental alertness is an essential prerequisite to receiving attendant care services, they could satisfy this prerequisite by the use of surrogates.  They claim that the failure to allow this reasonable modification violates the ADA and the regulations implementing the Act.  The State, on the other hand, takes the position that the modification requested by the plaintiffs is unreasonable, and is not required under the regulations implementing the ADA.

The test to determine the reasonableness of a modification is whether it alters the essential nature of the program or imposes an undue burden or hardship in light of the overall program.  School Bd. of Nassau County v. Arline, 480 U.S. 273, 287 n. 17 (1987); Alexander v. Choate, 469 U.S. 287, 300 (1985); Nathanson v. Medical College of Pennsylvania, 926 F.2d 1368, 1384-86 (3d Cir. 1991).  An analysis of the proposed modification leads us to conclude that Easley and Howard's suggested modification, the use of surrogates, would, at the very least, change the entire focus of the program.  The focus fundamentally would shift from the provision of attendant care

and its societal objectives for the physically disabled to personal care services to the many thousands of physically disabled who are often served by other specially designed state programs.  The proposed alteration would create a program that the State never envisioned when it enacted the Care Act.  The modification would create an undue and perhaps impossible burden on the State, possibly jeopardizing the whole program, by forcing it to provide attendant care services to all physically disabled individuals, whether or not mentally alert.  We therefore hold that the use of surrogates would be an unreasonable modification of the attendant care program under the Act.

C. The Care Act and the ADA.

The district court agreed with Easley and Howard's interpretation of 28 C.F.R. § 35.130(c) that physically handicapped persons cannot be rendered ineligible for the program because they also are afflicted with a mental disability that leaves them mentally unalert.  To support its analysis the district court cited the regulations implementing Title III of the ADA which distinguish between offering services to one class of persons with disabilities and barring a person with the same needs because the individual has another disability.  The regulation states in part:

> A health care provider may refer an individual with a disability to another provider, if that individual is seeking . . . services outside of the referring provider's area of specialization, and if the referring provider would make a similar referral for an individual without a disability who seeks or requires the same treatment or services.

28 C.F.R. § 36.302(b)(2).

The plaintiffs acknowledge that the State may lawfully provide an attendant care program serving individuals with a certain handicap, but assert that the State discriminated against them because they have an additional handicap. As discussed earlier in this opinion, the Care Act does not discriminate against the mentally disabled; it focuses on a different class of handicapped. The language of the Rehabilitation Act, the ADA, the Independent Report to the PDPW, and the regulations implementing the acts contemplate and point to specific classes of disabled. The State emphasizes the power of government to design a program for a particular class of handicapped. As an illustration, it cites the Randolph-Sheppard Act, which provides vending licenses to blind persons. 20 U.S.C. 107(a) (1990). There are other programs offered by the Commonwealth of Pennsylvania, e.g., the Comprehensive Mental Health and Retardation Act to which we have alluded, a program for the deaf and hearing impaired, 43 Pa. C.S.A. § 1463 et seq., and a program for the care and treatment of persons suffering from chronic renal diseases, 35 Pa. C.S.A. § 6201 et seq.

Our reading of the Care Act is not inconsistent with the ADA and the Rehabilitation Act. The regulations implementing these acts contemplate reaching groups of disabled without incurring obligations to other groups of handicapped. Cases interpreting the Rehabilitation Act have stated that their main thrust is to assure handicapped individuals receive the same

benefits as the non-handicapped.  The Supreme Court in Traynor v. Turnage, 485 U.S. 535, 548 (1987), declared "[t]here is nothing in the Rehabilitation Act that requires any benefit extended to one category of handicapped persons also be extended to all other categories of handicapped persons."

The State has not rejected Easley and Howard from the program because, mentally unalert, they are unworthy of help; the State merely distinguishes this program established by the Care Act from a program providing assistance to the non-mentally alert physically disabled.  This is not a case of State discrimination against a subgroup of the group of people who are physically disabled.  On the contrary, this is a case where an additional handicap, a severe degree of mental disability, renders participation in the program ineffectual.

### III.  CONCLUSION

We therefore hold that the Pennsylvania Attendant Care Services Act which requires that qualified persons be not only physically handicapped but also mentally alert does not violate the ADA's non-discriminatory purposes.  We further hold that the use of surrogates by the non-mentally alert physically disabled is not a reasonable modification of the Pennsylvania Attendant Care Services Act.

Accordingly, the judgment of the district court will be reversed.  Each side to bear its own costs.